## APPENDIX

In re E.H.

G.H., Appellant.

No. 96–FS–1804.

District of Columbia Court of Appeals.

Argued May 26, 1998.
Decided Oct. 1, 1998.

Judith A. Lovelace, appointed by the court, for appellant.

Susan R. Van Bell, appointed by the court, for appellee E.H.

Jon S. Pascale, appointed by the court, for appellee M.U.

Jo Anne Robinson, Principal Deputy Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief for appellee District of Columbia.

Before WAGNER, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge.

On October 4, 1996, following a fact-finding hearing, a Superior Court judge found that respondent E.H., who was then almost three years old, was a neglected child. The judge's decision was based on the mental illness of E.H.'s mother, G.H., and on the consequences for E.H. of the mother's bizarre beliefs and conduct. On appeal, the mother contends that the finding of neglect was not supported by the evidence, and that the court intruded inappropriately on G.H.'s right to raise her daughter.

The case is a troubling one, for the evidence shows beyond doubt that G.H. loves E.H., that she has tried hard to be a good mother, that she has conscientiously attended

to most of her daughter's material needs, and that she has not intentionally neglected E.H. or purposely done her harm. The trial judge nevertheless found, on the basis of substantial expert testimony and other evidence, that E.H. has special needs, and that in light of the mother's psychological disorder and the conduct to which that condition has led, the early intervention of public authorities was required to protect the daughter's well-being.

We conclude that the judge's dispositive findings were not clearly erroneous and that there was no error of law. Accordingly, we affirm.

## I.

## THE TRIAL COURT PROCEEDINGS

### A. *General background.*

E.H. was born on December 17, 1993. Her parents were not married, and E.H.'s father, M.U., did not live with G.H. For the first two years of her life, E.H. resided with her mother.

On December 7, 1995, Diane Nguyen, a social worker then employed by the Department of Human Services (DHS), filed a petition in the trial court alleging that E.H. was a neglected child, in that she was without proper parental care and supervision, *see* D.C.Code § 16–2301(9)(B) (1997), and in that her mother was unable to discharge her parental responsibilities on account of mental incapacity, *see* D.C.Code § 16–2301(9)(C). On January 16, 1996, following an initial hearing on the petition, E.H. was placed with her father under the protective supervision of the court. E.H. has lived with her father since that time, and that placement was continued in effect following the fact-finding hearing. The mother has had unsupervised visitation rights.

### B. *The mother's mental illness.*

The trial judge found, on the basis of essentially undisputed evidence, that the mother suffers from a "delusionary disorder, persecutory type." This diagnosis was confirmed by the District's expert witnesses [1] and by the mother's experts [2] as well.[3] The mother had been admitted to St. Elizabeths Hospital for this affliction for a month during the autumn of 1994.

For purposes of the present case, the principal expression of the mother's delusionary disorder was her steadfast belief that there were toxic fumes in her apartment and that these fumes were endangering her daughter's health and her own health as well. The mother reported these fumes on a number of occasions to the police and to the fire department, but no public agency confirmed the presence of fumes.[4]

When the DHS social worker, Ms. Nguyen, was unable to detect any fumes in the apartment, the mother reported that she (the mother) and her daughter were the only persons who could smell them.[5] Although she was offered the opportunity to move to a different apartment, G.H. declined to do so. She stated that there had also been toxic fumes in her previous residence, and that the fumes would probably follow her if she moved. The mother testified that new pipes had been installed under her sink while she was at St. Elizabeths Hospital, and that some of the fumes were coming into the apartment through these pipes. At various times she assigned blame for the fumes to her brother and to her landlord, to the occupants of units

---

1. The District's expert witnesses were Mark Weissman, M.D., a pediatrician, and David Missar, a clinical psychologist. Dr. Janice Hutchinson, a psychiatrist, was not available to testify, but a written report of her examination of G.H. was admitted by consent.

2. Spencer Johnson, M.D., a psychiatrist, and Sylvia Pierson–Ward, a therapist who was qualified in the area of counselling, testified as experts on behalf of the mother.

3. The mother testified, however, that she believed the diagnosis of mental illness to be erroneous.

4. The mother testified that she had the apartment tested but that "the fumes were not going on at the time of the testing."

5. The mother told Dr. Weissman that only she and her daughter could see the fumes.

above and below hers, and to unknown conspirators.

G.H. attributed remarkable effects to the toxic fumes. According to Dr. Missar, the District's psychiatric expert, the mother told him that the fumes

> were putting her daughter into a deep sleep from which she was difficult to awaken.

> She stated that they also clouded her ears, her hearing, her own hearing. She stated that she would put baking soda on her daughter's mouth in an attempt to revive her when she could not awaken her [6] and ... she made several statements about the incident that seemed to me to be peculiar and possibly bizarre in terms of animals dying in her apartment, particularly cockroaches that died standing up, that were reportedly killed very quickly by these toxic fumes. And Ms. H. also commented that her family did not believe her.

The mother's preoccupation with toxic fumes was not the only manifestation of her delusionary condition. She was of the opinion that the other members of her family were ganging up on her and plotting to destroy her.[7] The mother claimed that on one occasion she had been poisoned at her brother's house and that her daughter had ingested the poison while breastfeeding. She also alleged that E.H.'s father had attempted to drug or poison her (G.H.) by putting something in her drink. According to Ms. Nguyen, the mother did not permit E.H. to play with other children because the other children were making fun of her.[8]

G.H.'s apartment was tested for fumes, and E.H. was tested for lead poisoning and neurological disorders, all with negative results. The trial judge found, on the basis of substantial evidence, that the mother's beliefs about toxic fumes and about her persecution by others were the product of the mother's delusions.

**C. The effects on the daughter of the mother's delusions.**

The evidence at the fact-finding hearing revealed that the mother's obsession with imaginary toxic fumes had significant consequences for her daughter. This was of particular concern because, according to her pediatrician, E.H. was suffering from serious developmental delays, and she was substantially behind other children of her age in her understanding, communication, and language skills.

On several evenings during 1994, the mother, who lived in a sixth floor apartment, brought E.H. on to the balcony in order to escape the fumes. Mother and daughter then spent the night on the balcony. At the time, E.H. was approximately seven months old. This situation troubled Ms. Nguyen, who apprehended that the child might move and slip between the balcony's bars. The mother insisted that E.H. was too young to wander off, but she assured Ms. Nguyen that she would not have her daughter sleep on the balcony again.

The mother also testified that "it was hard to have a daily routine with the things that were going on in the apartment."[9] She stated that her daughter "missed out a lot of her life because she was unconscious a lot of times." According to the mother,

> [t]here was no consistency. Sometimes we'd get up and only be up for like a couple of hours or so before something would come in and put her in a sleep state.... Sometimes something was in her[e] keeping us up [at night]. She was running around like it was daytime and would be playing with the toys ... like it was daytime.

By the mother's own admission, E.H.'s life was unpredictable and somewhat chaotic. As a result, E.H. was usually asleep when the DHS social worker visited the apartment

---

6. The mother testified at the hearing that the fumes sometimes awakened her daughter and, at other times, put her daughter to sleep.

7. The mother testified that "[m]y brothers and sisters always did things to me down through the years, but it's just gotten out of hand."

8. Several witnesses testified, however, that E.H. was permitted to play with the other children and that E.H. did.

9. G.H. confirmed that the "things" to which she was referring were the toxic fumes.

during the daytime, and Ms. Nguyen testified that the child was generally unable to respond to repeated attempts to engage her. Dr. Weissman, E.H.'s pediatrician, testified that when E.H. was brought into his office, she would be asleep in a stroller—an unusual circumstance for a child of her age.

Other aspects of life in the mother's household were dominated by the omnipresent but imaginary fumes. Ms. Nguyen testified that when she came to the mother's apartment, the perishable food was in the refrigerator, but the remainder of the food and the dishes were kept in the living room in order to protect them from the fumes. The windows were kept open, regardless of the temperature. G.H. also took her daughter to the emergency room on several occasions to have her tested for fumes.

#### D. *The mother's attention to the daughter's needs.*

It is essentially undisputed that G.H. hugged and kissed her daughter, took her to the park and to museums, and attended conscientiously to her daughter's material needs. According to all of the witnesses, E.H. was clean and appropriately dressed and well-nourished. There was no indication of physical abuse or unkind treatment.[10] Indeed, according to one defense witness, G.H. "has a way with kids."

The mother also recognized that E.H. was suffering from developmental delays. Dr. Weissman, the District's lead-off witness, testified that G.H. followed up on various referrals suggested by him. Indeed, Dr. Weissman stated:

> It is correct that she certainly showed great concern for her daughter. It's correct that she ... was willing to pursue these other evaluations and took her daughter to see the other specialists.... My observations are that Ms. H. genuinely loves her daughter.... Not a question in my mind about that.

The trial judge recognized that the mother's intentions were good and that "the petition in this case was not based on a pattern of neglect, such as a failure to provide food, clothing or shelter." Rather, according to the judge, "the petition had a narrower theory, which was that [G.H.'s] psychiatric illness prevented her from providing the proper parental care to her child."

#### E. *The opinions of the experts.*

The expert witnesses for the District and for the mother all agreed that the mother, though well-motivated, was mentally ill, and that she suffered from a delusionary disorder, but they disagreed in significant measure as to the effect of the mother's psychological condition on her ability to be an effective parent. The District's experts believed that, under all of the circumstances, the mother could not parent E.H. successfully. The mother's experts thought that, given certain safeguards, the mother would be able to do so.

Although, as we have noted, E.H.'s pediatrician was favorably impressed by the mother's love for her daughter, he expressed profound concern regarding the mother's ability to deal with E.H.'s special developmental needs. He explained that "one of the most critical windows for [a child's] speech development is really in [the] period between the first birthday and the ensuing year or two," and that if remedial measures were deferred until the child was four or five years old, then "we've lost a tremendous opportunity to help improve [her] speech and [her] language development." Dr. Weissman stated that notwithstanding the mother's good intentions and her readiness to follow up on referrals, she insisted on "seeing things solely in terms of stories and findings that don't make any medical sense." Under these circumstances, Dr. Weissman questioned whether the mother "would be consistently available in an emotional and developmental way to make sure that [E.H.] got the needed services and interventions outside the home and within

---

**10.** E.H. first came to the attention of DHS after the police received a report that E.H. had been burned on the leg. The burn had apparently been inflicted by an acquaintance of the mother outside the mother's presence. It does not appear that the mother was culpable in this incident. Although the burn was mentioned in the neglect petition, no party has claimed that the incident constituted child abuse or neglect on the part of the mother.

the home." In sum, according to Dr. Weissman, "Ms. H's psychiatric state did not reassure me that she could consistently understand and follow through and provide the kind of nurturing and home stimulation that E.[H.] was definitely in need of during this developmentally sensitive window."

Dr. David Missar, the clinical psychologist who testified for the District, also had severe doubts regarding G.H.'s ability to parent her daughter. Dr. Missar examined G.H. on March 6, 1996, when E.H. was a little more than two years old. It was Dr. Missar's opinion, based on the mother's mental health symptoms, that "she was unable to parent at that time without the administration of anti-psychotic medication ... and psychotherapy." In fact, Dr. Missar believed that the mother's condition, which he described as "delusional disorder, persecutory type," [11] "could significantly impair her ability to parent and may, given some of Ms. H's past behavior, put her daughter in danger." He stated that the mother's personality testing suggested "a hyper-vigilant outlook toward her environment, suspiciousness ..., considerable anger, and isolation from others."

Dr. Janice Hutchinson, the medical director of the District's Child and Youth Services Administration, conducted a psychiatric evaluation of G.H. in March 1996. Dr. Hutchinson confirmed in her report that, according to available records, the mother had "definitely been in a delusional state at various times in her life," but that she "appears to be genuinely unaware of [her condition]." Dr. Hutchinson recommended anti-psychotic medication, individual therapy, and possibly family therapy. She stated that G.H. should "be allowed visitation with her daughter *but always in the presence of another adult.*" (Emphasis added.) The italicized language

obviously indicates that, in Dr. Hutchinson's opinion, the mother's psychological condition so impaired her parenting ability that unsupervised visitation was inadvisable. Dr. Hutchinson's position necessarily implied that G.H. could not be a successful custodial parent for E.H., especially without supervision, and that protective intervention by public authorities was in E.H.'s best interest.

Dr. Spencer Johnson, a psychiatrist who was employed by the District's Commission on Mental Health Services, and who headed the Professional Network Group (PNG) at which G.H. received therapy, testified as an expert witness for the mother. Dr. Johnson agreed that G.H., whom he examined in March 1996, was suffering from a "delusionary disorder, persecutory type," a diagnosis that includes paranoia but excludes schizophrenia. [12] Dr. Johnson testified, however, that, in his opinion, the mother's mental health problems did not interfere in any way with her ability to parent her daughter, and that the mother was not a danger to her child. [13] This was so, according to Dr. Johnson, because the mother's delusions "are fairly well what we call circumscribed," and therefore "don't interfere with the ability to parent especially a special child because they're related to people outside the immediate environment." G.H.'s belief that members of her family were conspiring against her would not affect her parenting skills because "it's apples and oranges." Dr. Johnson presumed that reunification should be accompanied by therapy,[14] but he stated that "she doesn't have to be in therapy before reunification."

Dr. Sylvia Pierson–Ward, a psychotherapist who worked at PNG under Dr. Johnson's supervision, testified that she met with the mother on a weekly basis from December

---

11. Dr. Missar stated, however, that this diagnosis does not in and of itself, impair the ability to parent.

12. According to Dr. Johnson, a paranoiac might believe that the police have him under surveillance, while a schizophrenic might feel that aliens have him under surveillance.

13. With respect to the advisability of treating the mother with medication, Dr. Johnson stated that "in my experience in treating a dozen or so people with this same diagnosis, medication does little more than alleviate some of the anxiety around the paranoia. It does not really eliminate the thoughts of being persecuted that well."

14. Dr. Johnson stated that if the mother was not in therapy, then the view expressed by Dr. Weissman that the mother always focuses on the fumes, and not on the real causes of E.H.'s developmental delays, "would be of concern to me."

1995 to May or June 1996 for individual therapy and parenting classes.[15] Dr. Pierson–Ward testified that, in her opinion, the mother was "delusional," but that the mother's mental health problems did not interfere with her ability to parent her daughter: "Not at this point. That's my opinion." On cross-examination Dr. Pierson–Ward stated that the mother's conduct in having her infant daughter sleep on the balcony "could be harmful to a child, but I don't necessarily see that it would be."

### F.  The trial judge's decision.

On October 4, 1996, the judge announced her oral findings of fact and conclusions of law from the bench. On November 13, 1996, she issued written findings and conclusions which largely followed her oral decision.

After describing the evidence relating to the mother's mental condition, the judge explicitly recognized that

> neither the proof that the mother is suffering from a mental illness nor the fact that the mother has delusional beliefs is sufficient for the government to prove that [E.H.] is a neglected child. The government must show a nexus between this psychiatric condition and the failure to provide proper parental care.

The judge found, however, that the District did establish the required nexus, and that the mother's condition "did incapacitate the mother in providing care to [E.H.] during the time in question."

In support of this dispositive finding, the judge referred to the mother's past conduct in spending the night with her daughter on the balcony, her difficulty in maintaining an orderly routine, her obsessive belief that E.H.'s developmental difficulties resulted from toxic fumes, and the irrational actions which the mother took on the basis of that belief, including visits to the emergency room based on an imaginary condition. Relying

heavily on Dr. Weissman's testimony, the judge concluded that

> [G.H.'s] mental condition, which was untreated and unchecked,[16] prevented her from providing the necessary care required to address [E.H.'s] developmental needs during the time period which was the focus of the trial,

and that E.H. was therefore "a neglected child pursuant to D.C.Code Section 16–2301(9)(B) and (C) due to her mother's incapacitating mental condition."

On November 13, 1996, the judge entered a disposition order committing E.H. to the custody of DHS and providing that E.H. was to continue to live with her father under the protective supervision of the court. At the disposition hearing, the judge commented orally that the long term custody of E.H. was an issue with which another judge would have to deal.[17] Over the objection of counsel for the District, the judge ruled that the mother should continue to have a right to unsupervised visitation of her daughter.

## II.

### LEGAL ANALYSIS

### A.  The standard of review.

In a child neglect proceeding, the District has the burden of proving by a preponderance of the evidence that a child is neglected within the meaning of D.C.Code § 16–2301. See, e.g., In re A.S., 643 A.2d 345, 347 (D.C.1994). Where, as in this case, a claim of evidentiary insufficiency has been raised on appeal, the scope of our review is circumscribed by D.C.Code § 17–305(a), which provides that a "judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1997). In conformity with § 17–305(a), we must view the evidence in

---

**15.** According to Dr. Pierson–Ward, the mother participated actively in the therapy, but had to discontinue "because her Medicaid availability was not in force any more."

**16.** The judge noted Dr. Johnson's testimony that the mother could adequately parent a child provided that she was in treatment, but pointed out

that the mother was not in treatment either at the time E.H. lived with the mother or at the time of trial.

**17.** We were advised at argument that separate litigation is pending between the parents for the legal custody of E.H.

the light most favorable to the District and draw every reasonable inference in the District's favor. *In re S.G.*, 581 A.2d 771, 774–75 (D.C.1990). "An appellate court will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." *Id.* at 775 (quoting *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1328 (8th Cir.1984)) (internal quotation marks omitted). E.H.'s *guardian ad litem* (GAL) argues [18] that the "plainly wrong" standard applies to this appeal, and counsel for the mother does not assert the contrary.

The record before us also presents a potentially significant question of law, namely, whether and to what extent a finding of neglect may be predicated on the mother's mental illness and persecutory delusions. The trial judge ruled, as we have noted, that proof of the mother's illness, alone, would not be enough, and that the District was required to demonstrate the existence of a nexus between the mother's affliction and an inability on her part to provide E.H. with proper parental care. This ruling was eminently sound,[19] and no party has challenged it. We therefore agree that the standard of review set forth in § 17–305 applies to the present appeal.

### B. *The substantive standard.*

In the District of Columbia, a "neglected child" is a child

(B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or (C) whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity . . . .

D.C.Code § 16–2301(9). The District and the GAL contend that E.H. was without the care necessary for her physical and emotional health (subsection (B)) and that the mother was unable to discharge her parental responsibilities because of mental incapacity (subsection (C)). The trial judge found for the District on both grounds.

■ The term "child neglect," as used by lay persons, might reasonably be viewed as a pejorative characterization. Indeed, some neglect proceedings have in fact been based on a parent's "moral depravity." *See, e.g., State v. Greer*, 311 S.W.2d 49, 51 (Mo.Ct.App. 1958). Nothing in this record suggests wrongdoing on the part of G.H., nor does the evidence reflect unfavorably on her moral character. Lack of moral fault, however, is not a defense to a claim of child neglect based on § 16–2301(9).

■ "Neglect proceedings are remedial and focus on the child; they are critically different from criminal prosecutions, which are primarily concerned with the allegedly abusive parent." *S.G., supra*, 581 A.2d at 775 (citation omitted). As the mother acknowledges in her brief, "the relevant focus for the court under § 16–2301(9)(B) is the [child's] condition, not the [mother's] culpability." *In re B.C.*, 582 A.2d 1196, 1198 (D.C.1990) (per curiam). This is so because

[n]eglect does not require a finding of parental fault, only the inability or unwillingness to provide proper care for the child. Therefore, such inability based on the parent's mental incapacity may support an adjudication of dependency based on neglect.

1 HARALAMBIE, *supra*, § 11.12, at 585.

■ "The purpose of the child neglect statute is to promote the best interests of allegedly neglected children." *B.C., supra*, 582 A.2d at 1198. Because of its beneficent purposes, such legislation is liberally con-

---

18. The GAL prepared the principal brief on appeal favoring affirmance. The District filed a short memorandum expressing agreement with the GAL's brief.

19. "It is important to explore in detail what the diagnosis of mental illness actually means in terms of parenting ability. Many mentally ill parents function perfectly well as parents despite their mental illness." 2 ANN M. HARALAMBIE, HANDLING CHILD CUSTODY, ABUSE AND ADOPTION CASES § 13.13, at 27 (Rev. ed.1993) (hereinafter HARALAMBIE).

strued in the child's favor. *In re S.K.,* 564 A.2d 1382, 1388 (D.C.1989) (per curiam) (concurring and dissenting opinion).[20] In sum, in determining whether the trial judge erred in finding that E.H. was a neglected child,

> [w]e use the word "neglected" in its limited legal sense within the meaning of [§ 16–2301(9),] and not [in the sense] that this mother has failed in her duty to her [daughter] in any other respect.

*In re Sampson,* 37 A.D.2d 668, 323 N.Y.S.2d 253, 256 (App. Div.3d Dep't 1971), *aff'd,* 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (N.Y.1972); *see also In re Adam L.,* 111 Daily Wash. L. Rptr. 25, 31 (D.C.Super.Ct. Jan. 6, 1983) (quoting *Sampson* ).

C. *Assessment of the evidence.*

■ We do not believe that the judge was plainly wrong in finding that a limited measure of state intervention in E.H.'s life was required in her best interest. On the contrary, the judge's dispositive findings were solidly based on the opinions of all three of the District's experts. Moreover, since G.H. was not in treatment, the judge's order was at least arguably reconcilable with Dr. Johnson's views as well.

The mother argues that the 1994 balcony incidents were too stale to merit consideration, that taking E.H. on several trips to emergency rooms to check for the effects of toxic fumes was not contrary to the child's welfare, and that the mother's loving attention to E.H.'s physical needs, as well as the mother's receptiveness to Dr. Weissman's referrals, demonstrate that E.H. suffered no harm from the mother's delusional beliefs. In our view, however, it was not unreasonable for the trial judge, acting as *parens patriae* in the child's interest, to reject this analysis of the record.

It is undisputed that E.H. suffered from serious developmental delays and that her condition required immediate attention and treatment. This is of critical importance, for an individual who is able to parent a child with advanced or average skills may nevertheless be unable to carry out the additional responsibilities required to raise a child with special needs. *See, e.g., In re L.W.,* 613 A.2d 350, 358, 360 n. 24 (D.C.1992). Although it is true that the mother cooperated in E.H.'s treatment and that she consulted the professionals to whom Dr. Weissman referred her, there was a good deal more to the problem than that.

The reader will recall Dr. Weissman's doubts that the mother would be able to follow through and provide the kind of nurturing and stimulation that E.H. needed so badly. Surely the trial judge could reasonably find that Dr. Weissman had a credible point. It is difficult to imagine how E.H. could alleviate her problems with language and communication, or catch up with her peers, if she was consistently exposed at home to an atmosphere of almost total irrationality. Moreover, in this case, the source of that irrationality was the sole adult with whom E.H. had continuing contact.

At home, E.H.'s life was dominated by her mother's delusions and, in particular, by imaginary toxic fumes. On several occasions, she slept on the balcony to escape these fumes. The windows were kept open regardless of the temperature. The dishes were in the living room, as was most of the food. E.H. was taken to the emergency room for the treatment of imaginary ailments. Relatives and friends were suspected of responsibility for the fumes, and personal relationships suffered accordingly.

E.H. was already more than two years old when this proceeding was instituted. Soon, she would be asking questions, and her mother would be the principal source, if not the only source, of answers.[21] The trial judge could reasonably believe that the kinds of answers that E.H. would be likely to receive from a mother whose life was so dominated by persecutory delusions would not be helpful to the favorable resolution of the child's special needs.

---

**20.** The majority expressly stated its agreement with this portion of the separate opinion. *S.K., supra,* 564 A.2d at 1383.

**21.** Ms. Nguyen suggested to G.H. that E.H. spend some time in day care, in the hope that this would improve the child's communication skills. The mother declined to follow this suggestion.

Moreover, the mother's "hyper-vigilance" led her to suspect the members of her family, the father of her child, and other people, of plotting against her and of attempting to do harm to her and to E.H. as well. G.H.'s outlook, according to Dr. Missar, was one of suspicion, anger, and isolation from others. The·trial judge was not required to overlook the obvious danger that some or all of these traits might well have negative consequences for this particular child.

Finally, there was pragmatic evidence suggesting that, in relation to her developmental problems, E.H. was better off in her father's home than in her mother's. Dr. Weissman testified that after E.H. was placed with the father, she showed improvement and was more alert and responsive, in the confines of an office setting, than she had been previously. Dr. Weissman had no concerns about the father like those he had expressed as to the mother. Ms. Nguyen also had a favorable impression of E.H.'s adjustment in her father's home.

D. *The limited character of the state's intervention.*

In her eloquent and passionate brief in this court, appellate counsel for the mother argues that the heavy hand of the state has been unnecessarily and improvidently injected into the lives of this mother and child, and that the court has "failed [in its duty] to tread lightly when insinuating itself into the bosom of the family." According to counsel, the trial judge failed adequately to acknowledge "[t]he intangible fibers that connect parent and child." *Lehr v. Robertson*, 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Quoting from *In re Rinker*, 180 Pa.Super. 143, 117 A.2d 780 (Pa.Super.Ct.1955), counsel goes on to argue that

> [i]t is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme ·care, and only where the evidence clearly establishes its necessity.

*Id.* at 783. The argument is cogently presented, but we do not believe that it carries the day.

In evaluating counsel's position, it is important to identify accurately what is at issue here and what is not. The trial judge did not terminate the mother's parental rights, nor has the judge been asked to do so. Further, the judge did not place E.H. in foster care with strangers. On the contrary, the effect of the court's intervention in the life of this family was to place the child with the father, with visitation rights ordered for the mother. Before the court intervened, the child lived with the mother, and it was the father who had the right to visitation.

The judge exercised restraint in dealing with a difficult situation. Although Dr. Hutchinson recommended that the mother have only supervised visitation, and although counsel for the District urged the judge at disposition to impose such a restriction, the judge held that the mother should continue to have the right to unsupervised visitation. The judge also left the issue of E.H.'s permanent custody to the colleague who was presiding over the separate custody litigation between the parties.

■ We have no quarrel with E.H's view that all branches of the government must exercise a prudent restraint when called upon to intervene in the lives of parents and their children. At the same time, however, the courts of this jurisdiction must carry out the legislative policies set forth in § 16–2301 *et seq.* We are satisfied that the trial judge conscientiously enforced the statute without unwarranted intrusion upon the mother's parental prerogatives. In order to protect the interests of E.H., the judge did what she reasonably believed she had to do, and no more. Accordingly, the judgment is

*Affirmed.*