882 A.2d 241 (2005)
In re N.P. and
In re I.P.
M.P. and B.P., Appellants.
Nos. 03-FS-313 to 03-FS-316.
District of Columbia Court of Appeals.
Submitted September 14, 2004.
Decided September 8, 2005.
*243 Ardelia L. Davis, Alexandria, VA, appointed by the court, was on the brief for appellant M.P.
Robert J. Warner, appointed by the court, was on the brief for appellant B.P.
Shirin Ikram, guardian ad litem, appointed by the court, was on the brief for appellees N.P. and I.P.
Robert J. Spagnoletti, Attorney General for the District of Columbia, Edward E. Schwab, Deputy Attorney General, and Sheila Kaplan and Darcy Cunningham, Assistant Attorneys General, were on the brief for appellee District of Columbia.
Before TERRY and GLICKMAN, Associate Judges, and BELSON, Senior Judge.
TERRY, Associate Judge:
M.P. and B.P., the parents of two young daughters, N.P. and I.P., bring these appeals[1] from two adjudications of neglect under D.C.Code § 16-2301(9) (2001).[2] In August 2002, the District of Columbia filed petitions alleging that N.P. and I.P. were neglected children[3] within the meaning of D.C.Code § 16-2301(9)(A), (B), (C), and (D).[4] After a four-day evidentiary hearing, *244 the trial court found that both children were "neglected" under subsections (9)(A), (9)(B), and (9)(C).[5] The children were then placed in foster care. We affirm in its entirety the trial court's judgment of neglect with respect to M.P., the father. With respect to B.P., the mother, however, because certain evidence was erroneously admitted, we vacate the court's finding of neglect under subsection (9)(C). Nevertheless, we affirm the final judgment as to the mother because it is supported by the trial court's finding of neglect under subsection (9)(B).

I. FACTUAL BACKGROUND
M.P. and B.P. are immigrants from Guyana and are of Indian descent. Their minor daughters, N.P. and I.P., came to the attention of the Child and Family Services Agency ("CFSA") on August 16, 2002, when the House of Ruth, a women's shelter, reported that B.P. left N.P. at the shelter  where they and I.P. had been staying  to return to her husband, M.P. The younger daughter, I.P., had already gone back to live with her father a few weeks earlier, but N.P. refused to go, citing concerns for her safety because of past incidents of domestic violence.
The District of Columbia filed two petitions the next day (one for each child) containing four allegations of neglect: (1) that N.P. had been abused by her father, and that her mother had failed to protect the children against physical and emotional abuse; (2) that the children were without proper parental care or control, and that the deprivation was not due to lack of financial means; (3) that the parents were unable to discharge their responsibilities because of mental incapacity, namely, substance abuse by the father and mental illness in the mother; and (4) that the mother refused to assume responsibility for N.P.'s care and control. At a show cause hearing, the court found that M.P. had physically abused N.P. and that the mother "may be developmentally delayed." The children were then placed in shelter care.
The government's neglect petition alleged an extensive history of domestic violence between the parents, citing a Prince George's County civil protection order ("CPO") against the father (which the mother later withdrew) and voluminous records of involvement with Cecil County Child Protection Services.[6] N.P., the older child, had spent some time in foster care in Cecil County and "reportedly ... would prefer to return to foster care." The neglect petition also alleged, on the basis of statements by N.P., that the mother was intimidated by the father because of this history of abusive treatment, and that the father would go "out of control" and become physically abusive when he drank.[7] N.P. also reported that her father struck her when she attempted to intervene.
*245 The government moved for mental health evaluations of both children. The court granted the motion, ordering in addition that the father refrain from contacting the children outside of supervised visitation and not attempt to locate them.[8] On October 10, 2002, the petition was amended to include additional allegations that I.P., the younger daughter, had been sleeping in the same bed with her father (and N.P. with her mother, in a separate area) and that I.P. had also written sexually explicit poems that apparently referred to her father.[9]
Several witnesses testified at the hearing on the neglect petition. N.P. described the physical abuse which her mother endured at the hands of her father and said that her father hit her when she tried to intervene. N.P. also stated that her younger sister, I.P., was frequently present during these incidents of domestic violence and that "as soon as she sees it, she runs into her room," where she "takes the blanket and pulls it over her head." Dr. Abby Washington, a psychologist and child therapist with the Children's Advocacy Center, who examined I.P., testified that in her opinion I.P. suffered from post-traumatic stress disorder and dysthymic disorder, which is a form of depression. Dr. Washington also stated that I.P. told her she had witnessed her father assaulting her mother on more than one occasion. Dr. Michael Gilliard, a clinical psychologist with the Department of Mental Health, who examined the mother, testified that in his opinion she suffered from dependency, impaired cognitive functioning, and "battered women's syndrome." In essence, he testified that B.P. was unable to carry out her role as a parent.
After hearing this and other testimony, the court found that the government had proved by a preponderance of the evidence that I.P. and N.P. were neglected and abused. In particular, the court found neglect under D.C.Code § 16-2301(9)(A) as to the father but not the mother,[10] and under subsection 9(C) as to the mother but not the father.[11] It found neglect under subsection 9(B) as to both parents.[12] Finally, the court concluded that the government did not meet its burden of proving neglect under D.C.Code § 16-2301(9)(D).[13]
More specifically, the court found that the children lived in a "chaotic and unstable environment" as a result of repeated moves from state to state, N.P.'s temporary placement in foster care, and the two moves to women's shelters in 2002. The court also noted the lengthy history of domestic violence between the parents. The father admitted that he struck his wife at least once, and the CPO issued against *246 him in Maryland indicated previous violence. N.P. testified that she had witnessed violence between her parents "for as long as I can remember" and that her father had hit her with a book, a belt, and a broomstick during drunken rampages.[14] Moreover, the expert testimony of both Dr. Hope Hill, who examined N.P., and Dr. Washington corroborated the children's statements that the violence had in fact occurred. In addition, the court found that the children themselves were subjected to their father's alcohol abuse, which often resulted in violence.
Further, the court found "role confusion in the home," in that N.P. functioned as her mother's mother, and I.P. essentially took on the role of her father's wife.[15] Additionally, the court concluded that B.P.'s ability to parent was "extremely limited" because of her dependency on her husband and children, and because she suffered from battered women's syndrome. As a result, the court found that both children had suffered emotional damage, including post-traumatic stress disorder, and that N.P. had also been subjected to physical harm. In addition, the court found that I.P. was suicidal, and that she was especially troubled because of her young age and her status as her father's pseudo-wife rather than his child.
Having found that the children were neglected, the court committed them to the custody of CFSA. The court authorized supervised visitation by the parents, but only if the children requested it. The court also ordered that the father complete a parenting class, attend counseling for anger management and domestic violence, and enter an alcohol treatment program. The mother was ordered to consult a therapist specializing in domestic violence, receive vocational training, and join a domestic violence support group. The parents filed timely notices of appeal.[16]

II. THE FATHER'S APPEAL
Appellant M.P. contends that Dr. Washington's testimony regarding I.P. was inadmissible hearsay. He further argues that, because "the government's chief proof that... I.P. suffered mental abuse and witnessed domestic violence came solely from the testimony of [Dr. Washington]," there was insufficient evidence to support a finding of neglect under D.C.Code § 16-2301(9)(A) and (B). We reject both arguments.

A. The Admission of Dr. Washington's Testimony

The father argues that "the testimony by the experts [was] not merely offered to identify any mental diagnosis, but [was] directly offered to prove the truth of the matter asserted." As a preliminary matter, the father failed to object to the admission of the doctor's testimony about I.P.'s emotional state or her presence during the alleged incidents of abuse. The father must therefore demonstrate plain error in order to win reversal on this *247 ground. See, e.g., In re S.S., 821 A.2d 353, 358 (D.C.2003) (citing cases); In re S.C.M., 653 A.2d 398, 404 (D.C.1995). Furthermore, when hearsay is admitted in evidence without objection, "a court may consider it and accord it full probative value." Rose v. United States, 629 A.2d 526, 531 (D.C.1993) (footnote omitted). We hold that, although Dr. Washington's testimony about I.P. was hearsay and did not come within any exception to the hearsay rule, its admission was not plain error.
Hearsay is a statement, made out of court, which is offered in evidence to prove the truth of the matter asserted. There are many exceptions to the hearsay rule; the one most pertinent here is the exception for statements made for the purpose of medical diagnosis. See, e.g., In re Ca.S., 828 A.2d 184, 190 (D.C.2003). We held recently in another neglect case that "statements attributed to the victim seeking medical treatment relating to the psychological and emotional consequences of the abuse ... may ... be admitted under the medical diagnosis and treatment exception to the hearsay rule." In re Kya. B., 857 A.2d 465, 472 (D.C.2004) (quoting Jones v. United States, 813 A.2d 220, 227 (D.C.2002) (internal quotation marks omitted)). The statements, however, must be "occasioned by a medical examination not merely `made to elicit evidence for use in the trial.'" Sullivan v. United States, 404 A.2d 153, 158 (D.C.1979) (citation omitted).
In the case before us, I.P.'s statements to Dr. Washington were made during the course of a court-ordered examination rather than a traditional therapy session. "Under the rule as stated in Sullivan, therefore, the medical diagnosis exception does not apply." In re Ca.S., 828 A.2d at 191.[17] Nevertheless, we see no reason to reverse the trial court on this point, since N.P. herself testified that she and her sister were both present during incidents of abuse. We are satisfied that no plain error occurred when the court admitted Dr. Washington's testimony with regard to I.P., since it merely duplicated N.P.'s firsthand account of the abuse that both she and her sister had witnessed.

B. Sufficiency of the Evidence: D.C.Code § 16-2301(9)(A)

The father further contends that, because Dr. Washington's testimony was hearsay, and because I.P. did not testify to any of the matters about which Dr. Washington testified, the court lacked sufficient evidence to find that I.P. was neglected under subsection (9)(A). For two reasons, we disagree. First, the father withdrew his initial request to have I.P. testify. He cannot now claim that her testimony was crucial to refute the evidence presented against him when it was he who decided that she would not be called to the stand. See, e.g., Brown v. United States, 627 A.2d 499, 508 (D.C.1993) (a party "may not take one position at trial and a contradictory position on appeal" (citations omitted)). Second, the father has failed to demonstrate that the evidence as a whole was insufficient to support the trial court's finding of neglect.
"In a child neglect proceeding, the District has the burden of proving by a preponderance of the evidence that a child is neglected within the meaning of D.C.Code § 16-2301." In re E.H., 718 A.2d 162, 168 (D.C.1998) (citation omitted). When we evaluate an appellant's claim that the evidence is insufficient to support a finding of neglect, we "must consider the evidence in the light most favorable to the government, giving full play to the right of *248 the judge ... to determine credibility, weigh the evidence, and draw reasonable inferences." In re S.G., 581 A.2d 771, 774 (D.C.1990). We will not set aside the trial court's finding unless it is "plainly wrong or without evidence to support it." D.C.Code § 17-305(a) (2001). That is not the case here.
In In re L.D.H., 776 A.2d 570, 575 (D.C. 2001), this court held that evidence that a child was present during episodes of domestic violence was sufficient to prove mental abuse under subsection (9)(A). In this case, not only did Dr. Washington testify that I.P. said she was present during multiple episodes of domestic violence between her parents, but N.P. also testified that I.P. witnessed her father abusing her mother on numerous occasions. The fact that I.P. often hid under the covers of her bed when such violence occurred is strong evidence that she recognized and was profoundly affected by the abuse. This evidence alone was sufficient to support a finding under subsection (9)(A), and the trial court did not err in so concluding.

C. Sufficiency of the Evidence: D.C.Code § 16-2301(9)(B)

Finally, the father maintains that direct testimony from I.P. was required to "negate the issue of mental trauma" sufficient to sustain a finding of neglect under subsection (9)(B). As we noted above, the father initially requested that I.P. testify at the hearing but later withdrew that request. After a lengthy discussion with counsel, the court decided that I.P. would be questioned in chambers in the presence of a court reporter, and counsel for the father was allowed to submit questions. The next day, however, counsel withdrew the motion for I.P.'s testimony, stating that it would be in the child's best interest not to take part in any formal proceedings at all.
The father now essentially blames the trial judge for his decision to withdraw the motion by claiming that the judge indicated to him that I.P.'s testimony would only serve to establish that he was a "narcissistic parent." This assertion is wholly unfounded. In the first place, the reasons for the withdrawal of the motion have no bearing on the fact that it was indeed withdrawn. Moreover, the judge's statement about M.P.'s narcissism was made only in his oral ruling at the conclusion of the case, and therefore could not have had any effect on the father's decision to withdraw the motion, which of course was made much earlier.
After examining the evidence in the light most favorable to the government, we conclude that it was clearly sufficient so show that I.P. was emotionally damaged from a lack of proper parental care. N.P. testified that both she and I.P. witnessed violence between their father and their mother, in their home, on a number of occasions. The father admitted that he slept in the same bed as I.P., and that I.P. gave him the highly sexualized poem that appears in the record. In addition, all of the experts who examined the family members testified that the familial roles were severely confused. We hold that there is no basis on which to reverse any of the court's findings regarding the father.

III. THE MOTHER'S APPEAL

A. The Admission of Dr. Gilliard's Testimony

Appellant B.P. argues that the trial court erred in admitting Dr. Gilliard's testimony about the results of her mental examination. Specifically, she contends that the government did not set forth sufficient facts and allegations in its petition to support a finding of neglect under D.C.Code § 16-2301(9)(C), and that, as a consequence, it was impermissible under *249 D.C.Code § 16-2315(e)(4) (2001) to allow Dr. Gilliard to give testimony about B.P.'s mental capacity based on his examination of her. This argument has merit.
D.C.Code § 16-2315(e)(1) provides that the trial court
may, on its own motion or the motion of any party, for good cause shown, order the mental or physical examination of the parent, guardian, or custodian of the child whose ability to care for the child is at issue.
However, D.C.Code § 16-2315(e)(4) states:
The results of the mental or physical examination shall not be admissible evidence in the factfinding hearing unless the allegations contained in the petition set forth facts which support a petition pursuant to D.C.Code, section 16-2301(9)(C). [Emphasis added.]
The petitions in this case did not meet this statutory standard. Dr. Gilliard testified about B.P.'s mental condition at the hearing, but the government's neglect petitions contained very little in the way of actual facts to support a subsection (9)(C) claim of neglect. The relevant portion of each child's neglect petition stated only that "said child's parent/guardian/custodian is unable to discharge his/her responsibilities to and for the child because of physical or mental incapacity (to wit, substance abuse and mental illness)." The petition contained no other factual allegations of mental illness or other incapacity with respect to the mother. On its face, therefore, the petition falls short of the requirements of section 16-2315(e)(4).
The guardian ad litem ("GAL") argues that the examination results were not privileged and that they were therefore properly admitted. He cites D.C.Code § 16-2359(e), which states in part that "neither the husband/wife privilege nor the physician/client or mental health professional/client privilege shall be a ground for excluding evidence in any proceeding brought under this subchapter." This provision, however, refers only to proceedings to terminate the parent-child relationship (title 16, chapter 23, subchapter III), and not to neglect proceedings  such as the one in this case  which are brought under subchapter I. We will assume that the GAL meant to cite former D.C.Code § 2-1355 (recodified in the 2001 edition as D.C.Code § 4-1321.05), which states the rule applicable to neglect proceedings:
Notwithstanding the provisions of §§ 14-306 and 14-307, neither the husband-wife privilege nor the physician-patient privilege shall be grounds for excluding evidence in any proceeding in the Family Division of the Superior Court of the District of Columbia concerning the welfare of a neglected child; provided, that a judge of the Family Division ... determines such privilege should be waived in the interest of justice.
This statute is not dispositive here, however, because the mother did not assert the physician-patient privilege as a basis for exclusion of Dr. Gilliard's testimony; indeed, she admits that she expressly waived that privilege.
Both the mother and the GAL cite In re O.L., 584 A.2d 1230 (D.C.1990), but that case is not helpful. The issue in In re O.L. was whether the trial court erred in overruling the mother's claim of physician-patient privilege with respect to the results of a court-ordered mental examination in a neglect hearing when the petition alleged neglect as defined in subsections (9)(B) and (9)(C). We concluded that the former D.C.Code § 2-1355 did not "automatically" waive the mother's privilege; rather, it gave the trial court the power to determine when a waiver would be in the interest of justice, id. at 1233, and "only after a *250 specific finding that the privilege should be waived . . . ." Id. at 1234.
As we have observed, however, the mother here does not seek the protection of the physician-patient privilege. Instead, she invokes D.C.Code § 16-2315(e)(4), which specifies that court-ordered examination results may be admitted at a fact-finding hearing only when the petition contains factual allegations that would, if proved, support a subsection (C) finding.[18] This was not an issue in In re O.L., because the petition in that case did contain detailed allegations about the mother's mental illness and drug usage. See id. at 1231 (quoting from the neglect petition).
Because the neglect petitions did not allege sufficient facts to meet the requirements of D.C.Code § 16-2315(e)(4), we hold that Dr. Gilliard's testimony about the results of the mother's mental evaluation was improperly admitted.

B. Sufficiency of the Evidence: D.C.Code § 16-2301(9)(B)

The mother next contends that there was insufficient evidence to support a finding of neglect under subsection (9)(B) because "there was no evidence of record that [she] willfully failed to do what was required of her." This court has held, however, that under D.C.Code § 16-2301(9)(B), "the court only needs to find that the children are without the statutory requirements." In re B.C., 582 A.2d 1196, 1198 (D.C.1990) (emphasis in original). In other words, willfulness is not an element that needs to be proved in order to establish neglect.
Neglect does not require a finding of parental fault, only the inability or unwillingness to provide proper care for the child. Therefore, such inability based on the parent's mental capacity may support an adjudication of dependency based on neglect.
In re E.H., 718 A.2d at 169 (citation omitted). Thus no affirmative act of wrongdoing is necessary to support a finding of neglect under this subsection. On the contrary, the best interests of the children are of paramount importance in neglect proceedings, and the court must consider "the entire mosaic" in making its determination. In re O.L., 584 A.2d at 1233 (citation omitted). In particular, the court may take into account "any history of, but also the reasons for, neglect  i.e., chronic indifference, carelessness, dereliction, inability to perform, etc." In re T.G., 684 A.2d 786, 788 (D.C.1996).
N.P. testified that she, not her mother, took the initiative to protect herself, her mother, and her sister from her father's violent behavior. According to Dr. Hill, N.P. was forced to take on the role of "parental child," meaning that she was often the caretaker in the family. Her role as surrogate parent clearly took a toll on her; Dr. Hill diagnosed her as suffering from "post-traumatic stress disorder of a chronic nature." Moreover, Dr. Washington testified that I.P., the younger daughter, had a "dysfunctional" and "inappropriate" relationship with her father, which her mother passively accepted. In addition, N.P.'s testimony established that I.P. witnessed domestic violence between her parents on numerous occasions. I.P. was also diagnosed with post-traumatic stress disorder, as well as depression and suicidal ideation.
Nevertheless, the mother maintains that the government succeeded in showing only *251 that she is an "ill-educated mother, who is in an abusive marriage and who cannot prevent her husband from going on drunken tirades at least once a month." Beyond that, she claims, there was no evidence that she failed to do what was required of her as a parent. While it is perhaps true that none of the circumstances we have outlined were the result of the mother's "willful failure" to perform any sort of parental function, the government did not have to prove any such willful failure. It merely had show that the children were neglected, i.e., "without proper parental care or control." D.C.Code § 16-2301(9)(B). The facts we have summarized here were clearly sufficient to support such a finding.

C. Sufficiency of the Evidence: D.C.Code § 16-2301(9)(C)

The mother also argues that there was insufficient evidence to support a finding of neglect under subsection (9)(C) because, as a matter of law, evidence showing battered women's syndrome, low intelligence, and "lack of Americanization" was inadequate to support a finding of "mental incapacity." The trial court based its (9)(C) finding on Dr. Gilliard's diagnosis of the mother as suffering from battered women's syndrome and "severe dependency needs." The mother maintains, however, that "mental incapacity" should encompass only "mental illness or retardation." She further asserts that the evidence cannot support a subsection (9)(C) finding because "the mother's issues with the father have no bearing on her fitness as a parent or her capacity as a parent."
We have found no case law to support the proposition that "mental incapacity" should be construed as referring only to a diagnosable mental illness. We have said, however, that "the government is `required to demonstrate the existence of a nexus' between a parent's ... mental incapacity and an inability to provide proper parental care." In re T.T.C., 855 A.2d 1117, 1119 (D.C.2004) (quoting In re E.H., 718 A.2d at 169). In this case the government presented, as evidence of the mother's inability to provide proper parental care, Dr. Gilliard's testimony about her battered women's syndrome, her low level of intellectual functioning, and her dependency on her husband and children. According to Dr. Gilliard, B.P.'s "dependent personality disorder" rendered her unable to make decisions on her own. In addition, the battered women's syndrome prevented her from seeing herself in a "positive parenting light." Consequently, Dr. Gilliard concluded that because of her mental condition, she was unable to carry out her role as a parent. The only other evidence of her mental capacity (or incapacity) was the father's assertion that his wife functioned at the level of a second-grader. Beyond that, there was no testimony linking the mother's various diagnoses with any deficient parenting decisions.
We have already held, earlier in this opinion, that Dr. Gilliard's testimony was improperly admitted. For that reason, we conclude that there was no valid evidence upon which the trial court could find that the mother was mentally incapacitated to such an extent that she was unable to care for her children. In this situation, we would ordinarily remand the case to the trial court for further proceedings, thereby enabling the government either to amend the neglect petition or to retry the case with additional evidence (if it has any). In this case, however, there is no need to do that, since we are satisfied that there was sufficient evidence to sustain the court's finding of neglect by the mother under subsection (9)(B). We therefore vacate the trial court's finding of neglect under subsection (9)(C), but leave the (9)(B) finding *252  and the judgment based upon it  undisturbed.

D. Concurrent (B) and (C) Findings

Finally, the mother maintains that the trial court's (B) and (C) findings were "mutually exclusive and contradictory." This is because, as she understands it, the court found that she willfully failed to provide parental care to her children (under (9)(B)),[19] but also that she was incapable of providing such parental care because of her mental incapacity (under (9)(C)). Thus, she argues, the two findings contradict each other. This argument is without merit.
We have, on many occasions, upheld (B) and (C) findings as to the same parent. See, e.g., In re E.H., 718 A.2d at 170-171. Contrary to what B.P. suggests, the two sections are independent of one another; indeed, the trial court's findings in this case serve as an example of their independence. The court's finding of neglect under subsection (9)(B) was based on the condition of the children, not on the mother's acts or omissions. This was entirely unrelated to the (9)(C) finding that the mother was "unable to discharge ... her responsibilities to and for the child[ren] because of ... mental incapacity," which focused not on the children's condition but on the mother's fitness as a parent and her ability to provide care. It was altogether proper for the court to make concurrent findings of neglect under these two different subsections, and the trial court committed no error in doing so.

IV. CONCLUSION
The judgment of neglect with respect to the father is affirmed in its entirety. The trial court's finding of neglect under D.C.Code § 16-2301(9)(C) with respect to the mother is vacated. However, because there is no reversible error affecting the finding under subsection (9)(B) with respect to the mother, the latter finding is upheld; accordingly, the judgment of neglect as to her is also affirmed.
So ordered.
NOTES
[1] Because each parent filed an appeal as to each child, there are four separate appeals, which we have consolidated.
[2] The statute under which the neglect petitions were filed, D.C.Code § 16-2301(9) (2001), has since been amended by the Prevention of Child Abuse and Neglect Act, D.C. Law 14-206, 49 D.C. Register 7815 (2002). Subsections (9)(A), (9)(B), and (9)(C) of the 2001 version are now codified as D.C.Code § 16-2301(9)(A)(i), (ii) and (iii) (2005 Supp.), respectively. The amendment, however, has no effect on this case.
[3] N.P. was fourteen years old and I.P. was ten years old when the neglect petitions were filed.
[4] At all times relevant to this case, D.C.Code § 16-2301(9) provided in part:

The term "neglected child" means a child:
(A) who has been abandoned or abused by his or her parent, guardian, or other custodian; or
(B) who is without proper parental care or control, subsistence ... or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or
(C) whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity; or
(D) whose parent, guardian, or custodian refuses or is unable to assume the responsibility for the child's care, control or subsistence and the person or institution which is providing for the child states an intention to discontinue such care ....
[5] The court found that the children were neglected under subsections (9)(A) and (9)(B) with respect to the father, and neglected under subsections (9)(B) and (9)(C) with respect to the mother. Neither parent was found to have neglected the children under subsection (9)(D).
[6] Prince George's County and Cecil County are both in Maryland.
[7] One such incident occurred at a Best Western hotel in Maryland where the family was temporarily staying, when the father allegedly became intoxicated and punched the mother. He also threw a cupful of an alcoholic beverage at her. Both daughters were present during this incident, and each independently sought help. The police responded and suggested that the mother file a petition for a CPO. The mother and her daughters then moved to a women's shelter, but the father located them, so they moved again, this time to the House of Ruth. That was where the family first came to the attention of CFSA.
[8] The father did not comply with this order.
[9] At least one such poem is in the record.
[10] The court found that the father, through his alcohol abuse and ongoing violent behavior towards his wife, which the children witnessed, inflicted mental injury on both children. As to the mother, however, the court concluded that in light of her diagnosis of battered women's syndrome, it could not "find that she failed to protect her children, as she was not capable of doing so."
[11] The court found that the father's alcohol abuse did not directly impair his ability to parent, although the resulting violence inflicted mental injury on the children. The mother's battered women's syndrome, however, combined with her "severe dependency needs," showed an inability to discharge her parental responsibilities due to mental incapacity.
[12] The court found that the children were without proper parental care and control as required by law, because the "entire mosaic" showed ongoing domestic violence, alcohol abuse, chaos, and psychological damage.
[13] This latter ruling is not challenged on appeal.
[14] The father admitted hitting N.P. with a paperback book and a belt, but not a broomstick.
[15] The unusual sleeping arrangements were one factor on which the court based this conclusion. The court did not credit the father's assertion that Hindu culture warranted these arrangements.
[16] About three weeks after the hearing, CFSA reported that both parents had engaged in unauthorized contact with the children. I.P. had received telephone calls and arranged meetings at bus stops, laundromats, and the parents' home, and N.P. reported that her father had sat in his car in front of her school. The court ordered the father to appear at a hearing and show cause why he should not be held in contempt; he did not appear, and a bench warrant was issued.
[17] In In re Ca.S. we expressly rejected an argument that we should "construe the medical diagnosis exception broadly, especially in cases involving children." 828 A.2d at 191.
[18] Both parties also cite In re N.H., 569 A.2d 1179 (D.C.1990), but it is not pertinent. The appellant in that case asserted a constitutional right to privacy, but did not invoke the protection of D.C.Code § 16-2315(e)(4).
[19] The court did find that the mother failed to provide parental care, but, contrary to the mother's assertion, it made no finding that this failure was willful.