In re P.B., D.B., & T.B.

**L.B., Appellant.**

Nos. 10–FS–1590, 10–FS–1591, 10–FS–1592.

District of Columbia Court of Appeals.

Submitted Jan. 24, 2012.

Decided Aug. 23, 2012.*

---

* The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment. It is now being published upon the court's grant of the guardian ad litem's motion to publish.

A.R. Marblestein–Deare, La Plata, was on the brief for appellant L.B.

Kathleen A. Muldoon, Minneapolis, MN, was on the brief for appellee D.W.

Irvin B. Nathan, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Pamela Soncini, Assistant Attorney General, were on the brief for the District of Columbia as appellee.

Amy Katherine Smith, guardian ad litem, was on the brief for appellees P.B., D.B., & T.B.

Before GLICKMAN and OBERLY, Associate Judges, and FERREN, Senior Judge.

OBERLY, Associate Judge:

L.B., the mother of P.B., D.B., and T.B., appeals the trial court's judgment affirming the magistrate judge's ruling that her three children are neglected within the meaning of D.C.Code § 16–2301(9)(A)(ii) and (iii) (Supp.2003).[1] The trial court affirmed three findings of neglect: (1) that L.B.'s oldest child, P.B., was neglected because he was "without ... education as required by law," D.C.Code § 16–2301(9)(A)(ii); (2) that all three of L.B.'s children were neglected because they were "without proper parental care or control ... necessary for [their] physical, mental, or emotional health" and that the deprivation was not due to lack of financial means, *id.;* and (3) that L.B.'s children were ne-

---

1. For convenience, and unless otherwise indicated, we refer to the Magistrate Judge and the Associate Judge who reviewed the findings and conclusions of the Magistrate Judge interchangeably as the "trial court."

glected because L.B. suffered from a mental incapacity that prevented her from "discharg[ing] ... her responsibilities to and for the child[ren]." *Id.* § 16–2301(9)(A)(iii). On appeal, L.B. challenges the sufficiency of the evidence supporting the findings of neglect. As to the finding of neglect under § 16–2301(9)(A)(ii), L.B. argues that: (1) the trial court should have concluded based on past school enrollment that L.B. would have eventually enrolled P.B. in school; and (2) the finding that the children were without the care necessary for their physical, mental or emotional health was based on events that were too dated to be probative and that were focused primarily on P.B. and that the decision to remove the children was made after a single visit to the home, during which there was no evidence that the children were unclean or uncared for. L.B. also challenges the finding that she has a mental incapacity within the meaning of § 16–2301(9)(A)(iii), arguing that neither expert could diagnose L.B. with a specific mental illness and that the evidence of L.B.'s mental incapacity was based on isolated facts "extracted over a span of years" and "grouped together without regard for time, frequency, or context." L.B.'s arguments are without merit. We affirm, holding that the evidence was sufficient to support all three findings of neglect.

## I. Facts

### A. Removal of the Children From L.B.'s Care

P.B., D.B., and T.B. were six years old, two years old, and about one month old, respectively, at the time they were removed from their mother's care in May 2010. The children had come to the attention of the Child and Family Services Agency ("CFSA") in April 2010 when CFSA received a hotline report from the Department of Social Services ("DSS") in Charles County, Maryland, soon after L.B. moved back to the District of Columbia after having lived in Charles County for slightly over a year. While living in Charles County, L.B. had come in contact with DSS after a Maryland circuit court issued a protective order giving L.B. custody of D.B. on the condition that she cooperate with DSS and abide by a safety plan. L.B. refused to cooperate. Her DSS case manager, Ronald Lenzy, made ten to fifteen attempts to visit her between December 2009 and April 2010 (when L.B. moved back to the District), but Lenzy was able to complete only one visit. L.B. was hostile and defensive toward Lenzy and threatened to have him arrested for stalking her. L.B. often refused to talk to Lenzy when he called, frequently changing her phone number and accusing him of being a spy. Lenzy was concerned because L.B. was not receiving prenatal care while pregnant with T.B., lied to him about not having medical insurance, and failed to attend a court-ordered mental health evaluation.

Binu Abraham, the CFSA social worker assigned to investigate the case when L.B. moved back to the District of Columbia, made several attempts to visit L.B. and the children at the address provided in the DSS hotline report. He also called L.B. on several occasions, but she refused to speak with him. Abraham made his first home visit on April 30, 2010, and L.B.'s mother answered the door. She told him that neither L.B. nor the children lived there. When Abraham returned four days later on May 4, he found L.B.'s mother and the three children in the home. L.B.'s mother told Abraham that L.B. had been arrested and was not in the home. Abraham and L.B.'s mother created a safety plan in which L.B.'s mother agreed to be present whenever L.B. was with the children.

On Abraham's third visit to the home on May 10, no one answered the door. Abraham called L.B.'s mother, who told him that neither L.B. nor the children were living in the home but that P.B. was enrolled in school. Still suspicious that someone was in the home, Abraham called the police, and when they came, L.B. opened the door with T.B. in her arms. She immediately started yelling and accused the police officers of being Muslim attackers. When Abraham tried to calm her, L.B. started cursing and laughing. She refused to answer any questions or discuss the safety plan. Abraham removed the children from her care that day. Soon thereafter, the District filed petitions alleging that P.B., D.B., and T.B. were neglected children.

At the fact-finding hearing before the Magistrate Judge in August 2010, evidence of neglect spanned the time period from P.B.'s birth in 2003 to the months following the May 2010 removal of L.B.'s three children from her care. In addition to hearing from Lenzy and Abraham, the Magistrate Judge heard testimony from: (1) L.B. herself; (2) Katherine King, Board of Child Care ("BCC") social worker; (3) Danielle Franks, BCC social worker; (4) Dr. Susan Theut, an expert in child, adolescent, and adult psychiatry; (5) L.B.'s stepmother, V.B.; (6) L.B.'s stepsister, T.F.; (7) L.B.'s mother; (8) D.W., the father of D.B. and T.B.; and (9) Dr. Naveen Maddineni, an expert in adult psychiatry, who testified on L.B.'s behalf.

**B. Condition of the Children and the Homes Where L.B. Lived With Them Prior to Their Removal From Her Care**

V.B., T.F., and D.W. testified about their experiences with L.B. and the children at various points in time since P.B. was born. V.B. testified that from the time P.B. was a few months old until he was four or five years old, she and L.B.'s father would take him for weekend visits. P.B. was often unclean, his clothes and fingernails were soiled, he had a lot of wax in his ears, and he smelled of urine. His hair was "long and dirty" and his shoes had no shoelaces. P.B. was often hungry, and V.B. believed he looked undernourished.

T.F. was a frequent visitor to L.B.'s various homes in the District after P.B. and D.B. were born. She testified that L.B.'s homes were unclean whenever she visited. "[B]alled up soiled" diapers lay everywhere. On more than one occasion, the kitchen sink was clogged with food. The homes were always very dark because the blinds were closed and there was only one lamp, which was on the floor without a shade. T.F. testified that P.B.'s bedroom "appeared to be a trash bedroom," cluttered with clothing and shoes and papers. The mattress in L.B.'s room was "extremely soiled" with "black spots on it" and no sheets. When L.B. moved to Charles County, T.F. visited her there and noticed again that the mattress was soiled and there were no sheets on the bed. During an evening visit in Charles County, T.F. found P.B. in his bedroom and he told her that he'd been in there all day. P.B. always appeared hungry and "extremely frail" and had "bags and black rings" under his eyes.

T.F. also had concerns about L.B.'s care of D.B. Two weeks after she was born, D.B. was still wearing the paper hospital shirt and the hospital band on her wrist, which was starting to chafe. T.F. always saw D.B. sleeping in her stroller—not a bed, although there was an unassembled crib in the home—and she smelled as if she had never been bathed. On one visit, T.F. noticed that D.B. was in an infant carrier that was too small for her, and her socks and toenails were "very dirty."

When D.W. would visit L.B.'s Charles County home to pick up D.B., he noticed there was "trash in the sink" and "everywhere," and "it wasn't clean at all." D.W. testified that D.B. was often unclean with "matted" uncombed hair, soggy diapers, and clothing that was too small.

The testimony of L.B.'s mother contradicted the testimonies of L.B.'s stepfamily and D.W. She described L.B.'s homes as always clean and well-stocked with food and the children as healthy and clean.

## C. L.B.'s Mental Health

Evidence of L.B.'s mental health was based on the observations of her stepfamily, D.W., social workers, and Drs. Theut and Maddineni. During her interactions with L.B., V.B. stated that L.B. seemed paranoid, concerned that Muslims were following her and that her upstairs neighbor was an arsonist who she had heard about on the news. At one point in 2007, she told V.B. that she heard voices in her head. D.W. also testified that L.B. was paranoid and always thought "somebody [was out] to get her." On one of T.F.'s visits to Charles County when L.B. lived there, T.F. noticed that L.B. had set up a closed-circuit television in her home to monitor the front of the apartment building. D.W. testified that L.B. "would barricade herself in the house." After her father's funeral in 2009, L.B. "secluded herself from the family" and "constantly changed her phone number."

L.B. was also known to overreact and become agitated and hostile. T.F. recounted a time when L.B. responded to P.B.'s nosebleed by "running through the house yelling and screaming and shouting dial 9-1-1." She reacted similarly soon after P.B. was born by calling an ambulance when there was blood on the area where P.B.'s umbilical cord had come off.

After the children were removed and placed in foster care, L.B. repeatedly overreacted during supervised visits. The social workers who supervised the visits between L.B. and her children described L.B. as hostile and very angry during the visits, yelling at the social workers in front of the children and threatening to sue the agency or "hurt somebody." During two separate visits, she became convinced that some of P.B.'s loose baby teeth had been knocked out by someone in the foster home, despite P.B.'s and the social worker's explanation to the contrary, and she called the police both times. L.B. often was so angry and preoccupied during the visits that she did not spend much time visiting with her children.

Dr. Theut evaluated L.B. on July 16, 2010, for a little over an hour. Before her evaluation, she had reviewed documents from DSS, including an initial mental health assessment, and referral letters from BCC, neglect petitions, a CFSA investigation, and a social study of L.B. During the evaluation, L.B. demonstrated "an elevated mood" and "pressured speech," and she expressed "concerns ... that there [was] a conspiracy against her" and that people she did not know were "trying to get back at her through trying to take her children away from her." Dr. Theut concluded that L.B. suffered from delusions and disordered thinking, and although more information would be needed for Dr. Theut to confirm a diagnosis, she concluded that L.B. showed signs of having a mood disorder. The additional testimony from family members about L.B.'s behavior supported Dr. Theut's "rule-out" diagnosis of a mood disorder.

According to Dr. Theut, a mood disorder like L.B.'s can interfere with a parent's ability to care properly for her children because "they become preoccupied with paranoid thinking, delusions, auditory hal-

lucinations, and they can become so wrapped up in that that they're not able to care for their children appropriately." As a result, young children "begin to feel very distant, and they feel that ... when they're upset or they need the parent, that parent's not available to them." Dr. Theut testified that when children witness their parents being aggressive, hostile, and "out of control," children can become very anxious; and when exposed to paranoid behavior, children may adopt their parent's paranoid views of the world.

Dr. Maddineni, the expert witness called on behalf of L.B., testified that during her 30– to 40–minute assessment of L.B., L.B.'s "speech was normal" and "she was logical, she was coherent," and she responded to questions "appropriately." Dr. Maddineni (who did not review any records and relied solely on L.B.'s self-reporting and her candor) saw no signs of depression or mania and no need for hospitalization or treatment, although she did conclude her evaluation with a tentative "rule-out" diagnosis of adjustment disorder and recommended that she see a psychiatrist "as needed." However, when presented with facts elicited from the testimony of family members and social workers, Dr. Maddineni agreed that the paranoid and delusional behaviors described, if true, indicated that L.B. "might be suffering from some kind of psychotic condition" that, without treatment, would "definitely impair one's ability to care for their kids."

### D.  P.B.'s Education

While enrolled in school in Charles County, P.B. missed 20 percent of school days, had been suspended from school, and was in danger of failing due to his high rate of absenteeism. Although the school was only "about 75 to 100 feet" from L.B.'s Charles County home, L.B. explained that she sometimes could not take P.B. to

school because she had to stay home to care for D.B. when D.B. was ill. When L.B. moved back to the District of Columbia, she did not enroll P.B. in school. L.B. testified that she tried to enroll him in school but was unable to do so because she did not have P.B.'s birth certificate and because she was on bed rest during the last month of her pregnancy with T.B.

The Magistrate Judge credited all the testimony except the testimony of L.B. and her mother and found all three children neglected. The reviewing judge affirmed the Magistrate Judge's decision.

## II.  Discussion

### A.  Standard of Review

In a child neglect proceeding, the District bears the burden of proving neglect by a preponderance of the evidence. When reviewing the sufficiency of the evidence supporting a finding of neglect, "we must view the evidence in the light most favorable to the District and draw every reasonable inference in the District's favor." *In re E.H.,* 718 A.2d 162, 168–69 (D.C.1998) (internal quotation marks omitted). This court will not "redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." *Id.* at 169 (internal quotation marks omitted). "[T]his court will reverse a finding of neglect only if it is plainly wrong or without evidence to support it." *In re A.B.,* 999 A.2d 36, 44 (D.C.2010) (internal quotation marks omitted).

In reviewing the evidence, we also must keep in mind that "[t]he neglect statute is a remedial enactment designed to protect the welfare of neglected and abused children, and it must be liberally construed to achieve that end." *In re A.H.,* 842 A.2d 674, 684 (D.C.2004) (internal quotation marks omitted). The trial

court "has the paramount obligation and broad authority to protect the best interests of the child where the parent is unwilling or unable to do so." *Id.* (internal quotation marks omitted).

### B. Sufficiency of the Evidence: D.C.Code § 16–2301(9)(A)(ii)

█ A child is neglected within the meaning of D.C.Code § 16–2301(9)(A)(ii) if the child "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent." The government need only prove that "the children are *without* the statutory requirements," *i.e.,* "without proper parental care or control"; no finding of parental fault is required. *In re N.P.,* 882 A.2d 241, 250 (D.C.2005) (internal quotation marks omitted). "[T]he relevant focus for the court ... is the child's condition, not the mother's culpability." *In re E.H.,* 718 A.2d at 169 (internal quotation marks omitted).

█ In evaluating the child's condition, "[t]he trial court's inquiry must go beyond simply examining the most recent episode," *In re T.G.,* 684 A.2d 786, 788 (D.C. 1996), or a single snapshot, and instead "must consider the entire mosaic in making its determination." *In re N.P.,* 882 A.2d at 250 (internal quotation marks omitted). We have held that the "entire mosaic includes an examination of any history of, but also the reasons for, neglect." *In re T.G.,* 684 A.2d at 788 (internal quotation marks omitted); *see also In re A.H.,* 842 A.2d at 685 (acknowledging that a finding of neglect may not be "predicated on nothing more than a single snapshot of the family's existence").

█ The trial court was not plainly wrong in finding that P.B. was without education as required by law when he missed so many school days that he was in danger of failing due to absenteeism and when P.B. remained unenrolled in school one month after moving back to the District. Because the focus of the court's inquiry is the child's condition and not the parent's fault, we find no error in the trial court's not crediting L.B.'s excuses for P.B.'s lack of school attendance and enrollment. *See In re E.H.,* 718 A.2d at 169.

█ Neither was the court plainly wrong in finding that all three children were without the proper parental care or control necessary for their physical, mental, or emotional health. In this case, the District sought to establish a pattern of neglect through testimony that covered a period of seven years. The testimony established that from the time after P.B.'s birth to the time L.B. lived in Charles County, her home was incredibly dirty and unsanitary, her children had poor hygiene, and she consistently refused to cooperate with social workers and to accept offers of assistance. Moreover, the evidence supports the trial court's conclusion that the deprivation was not "due to [L.B.'s] lack of financial means" because there was testimony that L.B. was receiving public benefits and she turned down multiple offers of assistance from family members and social workers. *See In re A.H.,* 842 A.2d at 688 ("[E]vidence that the parent had ... sufficient financial resources ... could take the form of evidence that the parent was receiving or was eligible to receive public assistance.").

Although the evidence of neglect in this case included testimony about particular visits to L.B.'s home that occurred several years ago, there was also testimony of more recent visits and interactions with L.B. and her children. In *In re Am. V.,* 833 A.2d 493 (D.C.2003), we upheld the

trial court's finding of neglect based on "a pattern of neglect" that "had existed over an extended period of time with respect to the children's hygiene, clothing, and timely attendance at school." *Id.* at 496 (internal quotation marks omitted). Likewise, in *In re E.H.*, 718 A.2d at 170, we upheld the trial court's consideration of events that occurred several years before the District filed neglect proceedings.

The fact that there was no account of L.B.'s home on the day her children were removed from her care does not erase the years of evidence presented to the trial court, especially in light of evidence that L.B. remained uncooperative and hostile and refused to allow the social worker to walk through the home. Although the record contains little evidence of neglect specific to T.B., who was only about one month old at the time she was removed from L.B.'s care along with P.B. and D.B., nothing in the record indicates that L.B. changed the pattern of neglect in her home, which affected all of her children. Moreover, the finding of neglect based on mental incapacity, which we uphold for the reasons outlined below, is based on evidence that clearly affects L.B.'s ability to provide proper parental care to T.B. as well as to P.B. and D.B.

### C. Sufficiency of the Evidence: D.C.Code § 16–2301(9)(A)(iii)

A child is neglected within the meaning of D.C.Code § 16–2301(9)(A)(iii) if the child's parent is "unable to discharge his or her responsibilities to and for the child because of ... mental incapacity." Proof of mental incapacity alone is not enough; the government also must show a "nexus between a parent's mental incapacity and an inability to provide proper parental care." *In re N.P.*, 882 A.2d at 251 (internal quotation marks omitted).

The trial court was not plainly wrong in finding that L.B. suffered from a mental incapacity and that there existed a nexus between her incapacity and an inability to properly care for her children. The trial court's finding of mental incapacity was based on the testimony of numerous witnesses who described L.B.'s paranoid beliefs, delusional thinking, and seclusion, and on the opinions of both experts, who agreed that such behavior supported the existence of a mental illness. This testimony presented sufficient evidence to support the trial court's finding. Although neither Dr. Theut nor Dr. Maddineni had done enough of an assessment of L.B. to confirm that she suffered from a particular mental illness, "mental incapacity" does not "refer[ ] only to a diagnosable mental illness." *In re N.P.*, 882 A.2d at 251.

In finding that there existed the requisite nexus, the trial court credited the experts' testimony that L.B.'s delusional, paranoid, and agitated behavior would cause her children anxiety and fear, preoccupy her, and otherwise impair her ability to provide proper parental care. L.B. is similar to the mother in *In re E.H.*, 718 A.2d at 170–71, "whose life was so dominated by persecutory delusions," including the belief in "imaginary toxic fumes," and who took her child "to the emergency room for the treatment of imaginary ailments" and suspected her family members of plotting against her and her child. Like the trial court in *In re E.H.*, which we held "was not required to overlook the obvious danger that some or all of [the mother's] traits might well have negative consequences for [E.H.]," *id.* at 171, we hold that the trial court in this case, acting as *parens patriae* in the children's interest, was not required to overlook the negative effects of L.B.'s apparent mental health issues on her children.

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*