*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-FS-770

IN RE Z.M.;

DISTRICT OF COLUMBIA, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(NEG-322-19)

(Hon. Jennifer Di Toro, Associate Judge)
(Hon. Kenia Seoane-Lopez, Magistrate Judge)

(Argued November 2, 2021                    Decided April 14, 2022)

*Pamela Soncini*, Assistant Attorney General, with whom *Karl Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General (at the time of argument), *Caroline S. Van Zile*, Principal Deputy Solicitor General (at the time of argument), and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for appellant.

*Madhavan K. Nair* for appellee.

*Katherine Piggott-Tooke*, Guardian ad Litem, with whom *Melissa Colangelo*, Guardian ad Litem, was on the brief.

Before GLICKMAN and DEAHL, *Associate Judges*, and THOMPSON,[*] *Senior Judge*.

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument. On October 4, 2021, she was appointed as a Senior Judge but she continued to serve as an Associate Judge until February 17, 2022. See D.C. Code §

Opinion for the court by *Associate Judge* GLICKMAN.
Dissenting opinion by *Associate Judge* DEAHL at page 23.

GLICKMAN, *Associate Judge*:   The District appeals an order of the Superior Court reversing a magistrate judge's adjudication of Z.M. as a neglected child. The District filed its neglect petition after Z.M.'s mother, C.M., twice left the eighteen-month-old child at day care and failed to pick him up at the end of the day, without contacting the day care, being reachable, or having someone else fill in for her, and without providing a satisfactory reason or excuse.  On review, the associate judge held that the findings of neglect were plainly wrong or without sufficient support in the evidence presented to and considered by the magistrate judge.  We reverse the associate judge and reinstate the magistrate judge's determination that Z.M. was a neglected child within the meaning of D.C. Code § 16-2301 (9)(A)(iv) (2021 Supp.).

**I.**

C.M. and Z.M. lived with C.M.'s mother, N.M., in the District.  When Z.M. was around eighteen months old, C.M. enrolled him in a day care facility, the Home Away From Home Child Development Center.  He went there for approximately six weeks.  On October 21, 2019, C.M. failed to pick him up from day care before

---

11-1502 & 1504(b)(3) (2012 Repl.) On February 18, 2022, she began her service as a Senior Judge. See D.C. Code § 11-1504.

closing time.  Neither she nor N.M. (the only other person authorized to pick Z.M. up) answered phone calls from the day care center.  At 7:00 p.m., the day care contacted the Metropolitan Police Department (MPD).  The police also tried to contact C.M. and were unable to do so.  Eventually, the police transported Z.M. to the Child and Family Services Agency (CFSA).  Less than two weeks later, on November 1, 2019, Z.M. again was left at the day care past its closing time and C.M. was not heard from and could not be reached.  A CFSA social worker retrieved Z.M. from the day care that evening.

After the second incident, the District filed a petition alleging that Z.M. was a neglected child within the meaning of paragraphs (ii), (iii), and (iv) of D.C. Code § 16-2301(9)(A).  Paragraph (ii) provides that a child is neglected if the child is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [the child's] physical, mental, or emotional health," and the deprivation is not due to a parent's "lack of financial means." Paragraph (iii) states that a child is neglected if the "parent, guardian, or custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity."[1]  Paragraph

---

[1]  The magistrate judge concluded that the government did not prove neglect under paragraph (iii) and that ruling is not challenged on appeal.

(iv) contains a narrower definition; it states that a child is a neglected child if the "parent, guardian, or custodian refuses or is unable to assume the responsibility for the child's care, control, or subsistence and the person or institution which is providing for the child states an intention to discontinue such care." The District based its neglect petition primarily on the allegation that C.M. was repeatedly unwilling or unable to assume the responsibility of caring for Z.M. after his day care center's closing time at the end of the day. At trial, the Guardian ad Litem (GAL), counsel from the Children's Law Center, supported the District's petition for a finding of neglect under both paragraphs (ii) and (iv) (but not paragraph (iii)).

**A. The Neglect Trial**

At the neglect trial held on February 27, 2020, then-Magistrate Judge Seoane-Lopez heard testimony from six witnesses — the day care director, two CFSA social workers, Z.M.'s pediatrician, C.M, and N.M. The District's witnesses were Veronica Rudd, director of the Home Away from Home Child Development Center, and Ashley Jamison, CFSA social worker. The GAL called LaTrina Sheppard, CFSA social worker, and Dr. Rebecca Carlin, Z.M.'s pediatrician. C.M. called N.M. and testified on her own behalf.

Veronica Rudd, director of the Home Away From Home Child Development Center, testified that the day care operated Monday through Friday, from 7:15 a.m.

until 5:45 p.m. When asked whether failure to pick up a child by closing time was a "problem," Ms. Rudd explained that it was, because "staff goes home and the building closes." During the six weeks Z.M. attended the day care, Ms. Rudd testified, C.M. typically dropped him off each morning and picked him up in the afternoons between 4:00 and 5:00 p.m. Only C.M. and her mother N.M. were on the list of persons who were preauthorized to pick the child up, and the day care would not release a child to someone not on the list absent specific parental consent for that occasion and an identification check. Ms. Rudd said C.M. did not inform the day care that anyone else would be picking up Z.M. on October 21, 2019, or November 1, 2019. On October 21, 2019, when C.M. did not arrive to pick up Z.M. by 5:45 p.m., Ms. Rudd began calling both C.M. and N.M., but could not reach either of them despite multiple attempts. At 7:00 p.m., after no one had come for the child, she called MPD, as required by the day care's policy, and they transported Z.M. to CFSA. Ten days later, on November 1, 2019, Z.M. again was left at the day care past closing time. After unsuccessfully attempting to reach C.M., Ms. Rudd released Z.M. to CFSA social worker Ashley Jamison, who took him to the agency around 6:20 p.m.

Ms. Jamison testified that she was assigned to the case when the police brought Z.M. to CFSA on October 21. Later that night, C.M. showed up at the agency to reclaim Z.M. C.M. told Ms. Jamison that she had arranged for a friend to

pick up Z.M. that day because she had to go to her workplace to do something. C.M. identified the friend only as "Da-Da." When asked, C.M. could not provide Da-Da's last name, address, phone number, or the text messages C.M. claimed to have exchanged with him about his picking up Z.M. for her. C.M. said she did not confirm with Da-Da that he had picked up Z.M. She assumed he had done so until she arrived home at 9:00 p.m. and found that Z.M. was not there. Ms. Jamison observed that C.M. appeared unconcerned and "seemed to be under the influence." Ms. Jamison asked her if she was "on something," and C.M. admitted to having smoked marijuana earlier that evening. Ms. Jamison then informed C.M. that to avoid Z.M.'s removal, there needed to be a safety plan in place for him while CFSA's investigation of the situation was ongoing. C.M. agreed to having a maternal cousin, R.N., take interim custody of Z.M. beginning that night, and that she would have supervised visitation with Z.M.

On November 1, 2019, Ms. Jamison learned that R.N. had not followed the agreed-upon safety plan for Z.M. and instead had returned him to C.M. Ms. Jamison then made several calls to both C.M. and N.M. to check on Z.M. Unable to reach either of them, she next called Z.M.'s day care. The day care was relieved to hear from her. It was late in the day, the day care was closing soon, Z.M. was still there, no one had come for him, and it had been unable to reach C.M. After 6:00 p.m., Ms. Jamison went to the day care and waited approximately fifteen minutes to see if C.M.

would show up. When she did not, Ms. Jamison brought Z.M. back to CFSA for the second time.

Ultimately, Ms. Jamison testified, because C.M. twice in ten days had failed to pick Z.M. up from day care or make suitable alternate arrangements, had been unresponsive to the day care and the agency, and had not exhibited concern for her child, CFSA determined a removal was in Z.M.'s best interest. On November 4, 2019, the District filed a neglect petition and Z.M. was placed in shelter care pending its adjudication.

LaTrina Sheppard, a CFSA permanency social worker, testified that during her first home visit after Z.M.'s removal, C.M. inquired about Z.M. and seemed relieved to know his foster care placement was in the District. However, when supervising visits with Z.M. and his family, Ms. Sheppard found it difficult to observe direct interaction between him and his mother due to the presence of N.M., and those positive interactions she did see "required[d] prompting." For example, she noticed C.M. "relied on her mom" to ensure Z.M. did not run out of the visit room when "he continued to open and close the door of the visit room," and there was a set of stairs nearby. Ms. Sheppard further testified that C.M. was required to attend parenting classes, undergo drug screenings, and complete an Addiction Prevention and Recovery Administration (APRA) assessment, and that while C.M.

verbally reported participating in the classes and screenings, Ms. Sheppard did not receive the corresponding confirmatory documentation. She reported that in this case, "it has been difficult to get details" from C.M. and that "communication ha[d] definitely been a barrier."

Dr. Rebecca Carlin, Z.M.'s pediatrician, testified that Z.M. was small when he was born and had a serious medical condition that required medication such that her team was "trying to track his weight very carefully" and was "quite concerned about medication compliance." Though Z.M. received the medication during his early infancy, C.M. stopped giving it to Z.M. when he got older (which the pediatrician had not instructed her to do). Despite missing scheduled visits, Z.M. was up-to-date on his vaccinations.

At the time of trial, C.M. was seventeen years old. She testified that she had arranged for Da-Da to pick up Z.M. from day care on October 21, and for Kyerra, "this girl" "from school," to do so on November 1. C.M. explained that she had missed calls from the day care on October 21 because her phone was off, that she did not always receive calls unless she was at home, and that she learned that Z.M. was at CFSA only when she got home on that day. Puzzlingly, C.M. maintained that Da-Da in fact *had* picked up Z.M. from the day care on October 21. As for the second occasion on which she did not come for Z.M., C.M. acknowledged that CFSA had

picked him up on November 1. She explained, "The second time, the girl did not pick him up, she was involved in a lot of thing[s], didn't even pick her own son up." She said she learned that Kyerra had not gotten Z.M. only when she arrived home that evening, despite the repeated calls from the day care.

N.M. testified that she had met Da-Da. She did not know his last name, but she said that Da-Da had picked up Z.M. from day care in the past, and that C.M. had asked him to pick up Z.M. from day care on October 21, 2019. N.M. said she herself could not receive calls or texts that day because her phone was "in and out" and "dying" and eventually she had to purchase another one. As for November 1, 2019, N.M. said that C.M. "had someone pick [Z.M.] up and they didn't."

While crediting the other witnesses, the magistrate judge found C.M. not to be credible and N.M. to be biased in favor of C.M. and only partially credible. The judge found that, twice within a period of ten days, C.M. had been unwilling or unable to pick up Z.M. herself or to arrange for someone else to do so, leaving him on both occasions without an appropriate caregiver after the day care closed. The judge stated, "Even if the mother did ask a friend to pick up the respondent, she failed to comply with the requirements of the daycare to communicate the alternative caregiver and add him or her to the pickup list, and the result was the respondent being left at the daycare twice in a ten day period, resulting in the need to call MPD

and CFSA." C.M.'s seeming indifference, lack of comprehension, and unsatisfactory explanations were highly concerning, even baffling.[2] The judge concluded that the District had proved by a preponderance of the evidence that Z.M. was a neglected child within the meaning of subsections (9)(A)(ii) and (9)(A) (iv) of D.C. Code § 16-2301, but not within the meaning of subsection(9)(A)(iii).

### B. Motion for Review

Following the magistrate judge's decision, C.M. filed a motion for review by an associate judge of the Superior Court.[3] C.M. argued that the evidence was insufficient to support the findings of neglect under either subsection (9)(A)(ii) or (9)(A)(iv), because her two failures to pick Z.M. up from day care did not show a lack of care or concern for the child or an unwillingness or inability to assume parental responsibility.

---

[2] The magistrate judge stated, "I find the mother's testimony troubling in terms of sitting here today, not understanding that there were two incidents where her child went into CFSA's custody because she failed to properly plan for someone to pick up . . . I'm not sure that you make plans for someone who you don't know their last name to pick up this child on two different occasions . . . [it] happening again shortly thereafter, leaves me to believe that she doesn't really understand the circumstances that she finds herself in . . . ."

[3] *See* D.C. Code § 11-1732(k); Sup. Ct. Gen. Fam. R. (D)(e)(1)(A).

When reviewing a magistrate judge's judgment after a bench trial, an associate judge acts in an appellate capacity, applying the same standards this court applies in reviewing trial court decisions.[4] The reviewing judge may not set aside the judgment "except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it."[5] The burden is on the District in a child neglect proceeding to prove by a preponderance of the evidence that a child is neglected within the meaning of D.C. Code § 16-2301.[6] In considering the sufficiency of the evidence supporting a magistrate judge's finding of neglect, the reviewing judge, like this court, "must view the evidence in the light most favorable to the District and draw every reasonable inference in the District's favor."[7]

---

[4] *In re Baby Boy C.*, 630 A.2d 670 (D.C. 1993); *Weiner v. Weiner*, 605 A.2d 18, 20 (D.C. 1992).

[5] D.C. Code §17-305(a) (2012 Repl.); *see, e.g., In re A.B.*, 999 A.2d 36, 44 (D.C. 2010). Accordingly, while questions of law are subject to de novo consideration on review, the magistrate judge's credibility assessments and factual findings must be accepted unless they are clearly erroneous.

[6] *In re N.P.,* 882 A.2d 241, 247 (D.C. 2005).

[7] *In re E.H.,* 718 A.2d 162, 168-69 (D.C. 1998) (internal quotation marks omitted).

In this case, the reviewing judge held the magistrate judge was "plainly wrong" in adjudicating Z.M. a neglected child under either subsection (9)(A)(ii) or subsection (9)(A)(iv) for three reasons:

First, the reviewing judge reasoned, "[t]o evaluate the child's condition for a neglect finding under subsection (ii), the trial court's inquiry must go beyond simply examining the most recent episode, or a single snapshot, and instead must consider the entire mosaic in making its determination."[8]  But here, the reviewing judge found, "[t]he trial court did not consider, and nowhere was it presented with, the 'entire mosaic' of the child's care."  Rather, the magistrate judge found Z.M. neglected based on only "[t]wo incidents in ten days," which the reviewing judge characterized as "the very definition of a 'snapshot' rather than a mosaic."  The government failed, the judge held, to shoulder its "burden to show a broader picture of neglect."

Second, the reviewing judge stated, "[e]ven assuming these two instances were serious enough to constitute neglect under D.C. Code § 16-2301, the record lacks any detail of the child's condition as a result," i.e., "the actual effect these

_____

[8] Quoting *In re P.B.*, 54 A.3d 660, 666 (D.C. 2012) (internal quotation marks and brackets omitted).

incidents had on Z.M." A "neglect finding under D.C. Code § 16-2301(9)(A)(ii)," the judge reasoned, "is to remedy the effect on the child, not to punish the mother."

Third, the reviewing judge concluded that the magistrate judge erred by finding that Z.M. was a neglected child within the meaning of subsection (9)(A)(iv) without having evidence and making a finding that C.M. herself (as opposed to the day care center) had stated an intention to discontinue caring for Z.M. Dismissing the magistrate judge's finding that "the mother, by failing to pick her child up, 'demonstrated an unwillingness or inability to provide care,'" the reviewing judge said "[t]hat may be a logical inference from her actions, but it is not a stated intention."

Accordingly, the reviewing judge granted C.M.'s motion for review and vacated the magistrate judge's order. Pursuant to D.C. Code § 16-2317(b)(2), the court dismissed the neglect petition and ordered Z.M. released to live with C.M. However, the District filed a timely appeal.

## II.

As a threshold matter, the GAL argues that this case is now moot because Z.M. has been returned home, the Superior Court has closed the neglect case, and (the GAL asserts) it is in Z.M.'s best interests "for there to be no disruption to Z.M.

at this time."[9] We think the case is not moot, however. "A case is moot if the parties have presented no justiciable controversy to the appellate court," and "an event that renders relief impossible or unnecessary also renders that appeal moot."[10] That is not the situation here, though, for in its role as *parens patriae* the District has a legally cognizable interest in the proper resolution of its neglect petitions,[11] as neglect adjudications have not only direct but also collateral consequences that serve to protect the child.[12] We therefore proceed to address the merits of the appeal.

Although the District argues that it proved Z.M. was a neglected child within the meaning of both subsection (9)(A)(ii) and subsection (9)(A)(iv), we find it necessary to consider only the latter provision.[13] The material facts are not in

---

[9] Brief of Appellee Guardian *Ad Litem* at 15 n.9.

[10] *Thorn v. Walker*, 912 A.2d 1192, 1195 (D.C. 2006).

[11] *See, e.g.*, *In re J.J.Z.*, 630 A.2d 186, 194 (D.C. 1993) ("In neglect proceedings, both the court and the Corporation Counsel have a *parens patriae* role which requires each to act to assure the best interest of the minor child at every stage of the proceeding.").

[12] *See In re E.R.*, 649 A.2d 10, 11 (D.C. 1994) ("[W]e hold that, because the adjudication of neglect has significant potential collateral consequences for the mother, her appeal is not moot.").

[13] *See, e.g.*, *In re K.J.*, 11 A.3d 273, 278-79 (D.C. 2011) ("As we have determined the mother neglected K.J. under the standard as set forth in D.C. Code § 16-2301 (9)(A)(iv) we need not reach a discussion relating to D.C. Code § 16-2301 (9)(A)(ii).").

dispute, and the question turns first and foremost on the proper construction of subsection (9)(A)(iv). This is a legal question, as to which our review is de novo.[14] In general, our guiding principle is that "[w]e will give effect to the plain meaning of a statute when the language is unambiguous and does not produce an absurd result."[15] "We also consider statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation to ensure that our interpretation is consistent with legislative intent."[16] Because "[c]ivil neglect statutes are designed to enable the state to identify and protect children who are in need of assistance[,] they are remedial and should be liberally construed."[17]

Subsection (9)(A)(iv) provides that a child is a neglected child if (1) the "parent, guardian, or custodian refuses or is unable to assume the responsibility for the child's care, control, or subsistence," and (2) "the person or institution which is providing for the child states an intention to discontinue such care." Thus, the statute

---

[14] *In re Ta.C.*, 237 A.3d 114, 120 (D.C. 2020).

[15] *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019) (internal quotation marks and citation omitted).

[16] *Williams v. Kennedy*, 211 A.3d 1108, 1110 (D.C. 2019) (quoting *Facebook*, 199 A.3d at 628).

[17] *In re O.L.*, 584 A.2d 1230, 1233 (D.C. 1990); *see also, e.g., In re S.G.*, 581 A.2d 771, 778 (D.C. 1990) ("Neglect statutes authorizing state intervention on a child's behalf are remedial, and they should be liberally construed to enable the court to carry out its obligations as *parens patriae*.").

"merely requires that the parent [refuse or] be unable to care for the child . . . and that the caretaker declare the intent to so discontinue."[18]  The specificity of subsection (9)(A)(iv)'s definition of a neglected child contrasts with the more general and much broader definition in subsection (9)(A)(ii).  Similarly, subsection (9)(A)(iv) does not require proof of abandonment, which is the basis for a neglect finding under subsection (9)(A)(i).[19]

We do not find the two-part test of this statute to be ambiguous, and we have no reason to accord it a grudging interpretation.  The reviewing judge apparently misread the second part of the statutory test as requiring a finding that *the parent* be found to have stated an intention to discontinue caring for the child.  Plainly, subsection (9)(A)(iv) applies when a person or institution that is caring for the child *in lieu of the parent* expresses such an intention, and the parent then refuses or is unable to assume the responsibility.[20]  And to the extent the reviewing judge also

---

[18]  *In re W.T.L.*, 825 A.2d 892, 894 (D.C. 2002).

[19]  In pertinent part, D.C. Code § 16-2301(9)(A)(i) defines a "neglected child" as a child "who has been abandoned . . . by his or her parent, guardian, or custodian."

[20]  *See In re K.J.*, 11 A.3d 273, 278 (D.C. 2011) (holding incarcerated mother neglected child under § 16-2301(9)(A)(iv) when she did not make any arrangements for child after grandmother's words and conduct indicated intention to discontinue care); *In re W.T.L.*, 825 A.2d at 894 (holding mother neglected child where she was unable to care for him due to homelessness and drug addiction, and caretaker stated her intention to discontinue caring for the child).

understood subsection (9)(A)(iv) to require a showing of an adverse impact on the child, that too was a misreading of a statute meant to protect children from harm. There is no such requirement in subsection (9)(A)(iv). It is not inapplicable merely because CFSA and the MPD provide a safety net for a child who otherwise would have been in harm's way.

Relatedly, a concern that the magistrate judge rested the finding of neglect on discrete conduct constituting a mere "snapshot" is misplaced; subsection (9)(A)(iv) makes discrete conduct the very basis for such a finding. Our statements that the court in a neglect case generally should consider "the 'entire mosaic' of the child's history and experience *relevant to the allegations of neglect*"[21] take into account which statutory definition of a neglected child is invoked. As we discuss below, the magistrate judge fulfilled this obligation in determining that Z.M. was a neglected child within the meaning of subsection (9)(A)(iv).[22]

---

[21] *In re Ta.C.*, 237 A.3d 114, 120 (D.C. 2020) (emphasis added).

[22] A broader inquiry into the neglected child's history and experience may well be necessary at the dispositional stage of a neglect proceeding. *See* D.C. Code § 16-2320 (2021 Supp.) (providing for a range of dispositional alternatives to be considered in light of the child's best interest and stating that "[i]t shall be presumed that it is generally preferable to leave a child in his or her own home"). No issue is before us in this appeal regarding the magistrate judge's dispositional placement of Z.M. in foster care after he was found to be a neglected child.

We do not construe subsection (9)(A)(iv) to require a finding of neglect whenever the evidence shows that a parent was unable to assume immediate responsibility for a child whose substitute caregiver stated the intention to discontinue care, no matter the reason or surrounding circumstances. For example, it is not enough for the government merely to prove that on a few occasions, a parent was momentarily unavailable to assume responsibility for a child whose substitute caregiver was ceasing care. Paragraph (iv) requires more. To establish a prima facie case of neglect under paragraph (iv), the government must present evidence that a parent was unable or refused to assume the responsibility of parenting the child — not simply that the parent was unavailable due to mere tardiness, mistake, or circumstances beyond the parent's control (such as getting in an accident or stuck in traffic on the way to pick up a child). Thus, as both a common sense reading of paragraph (iv) dictates and the legislative history of the provision confirms, the court must consider the surrounding circumstances and reasons for the parent's unavailability, as well as its duration, persistence, and recurrence. For example, where the evidence shows there was a reasonable explanation or satisfactory excuse for an isolated instance of unavailability, such as unforeseen circumstances beyond an attentive and concerned parent's control or a good faith mistake by the parent, the government presumably will be unable to, and will not seek to, establish a prima facie case of neglect under subsection (9)(A)(iv). A trial court's consideration of the

reasons for a parent's unwillingness or inability to assume responsibility of a child when the surrogate caretaker declines to continue shouldering that responsibility generally fulfills its obligation to consider the "mosaic" relevant to the alleged neglect.

The Council clearly intended to require such consideration when it amended the statutory definition of a neglected child in D.C. Law 2-22, the Prevention of Child Abuse and Neglect Act of 1977, to add what is now subsection (9)(A)(iv). The same legislation also enacted a companion provision, D.C. Code § 4–1301.05(e), prescribing police procedures for responding to reports of children "left alone or without adequate supervision."[23] The latter statute authorizes the police in such circumstances to transport the child to CFSA, with the proviso that doing so "shall not be considered a taking into custody as described in § 16-2309."[24] As the Committee report on the legislation explained, "[t]his section allows the Police to step in and take the child away if necessary for his safety, but *not be required* to follow the formal neglect petition procedure" each time they transport an

---

[23] D.C. Code § 4–1301.05(e).

[24] *Id.*

unsupervised child to CFSA.[25]  The Committee report emphasized that, while neglect petitions should be filed "where parents refuse to cooperate or where it is essential to protect the welfare of the child,"[26] immediate return of the child to the family without instituting neglect proceedings was justified in many cases. Illustratively, "[t]he parent may have been in an accident, or the baby-sitter failed to arrive as scheduled."[27]

By its plain terms, subsection (9)(A)(iv) applied to the facts found by the magistrate judge in this case.  The day care center was providing for Z.M.'s "care" within the meaning of the statute.  It had stated and informed C.M. of its "intention to discontinue such care" at the end of each day at closing time.  (The day care also so informed the police and CFSA.)  C.M. failed to "assume the responsibility for [Z.M.'s] care" when she twice failed to pick him up herself from his day care center before it closed or to make suitable arrangements for another responsible person to do so.  In her unexplained absence following the day care's discontinuance of care for the night, the police and CFSA had to step in to take care of Z.M.  And as to

---

[25] Council of the District of Columbia, Report of Committee on Human Resources and Aging on Bill 2-46, at 4 (Mar. 30, 1977) (emphasis added).

[26] *Id.*

[27] *Id.*

whether C.M.'s failures evinced her inability or refusal to fulfill her parental responsibility, the government presented (and the magistrate judge appropriately considered) the relevant surrounding circumstances and reasons C.M. offered for her failure to pick up Z.M.

As the government's evidence revealed, this was not a benign case in which the parent had a reasonable and credible excuse for briefly leaving her child alone and the problem was unlikely to recur. Rather, trial testimony established that on October 21, the first day C.M. failed to pick up Z.M., she did not answer numerous calls from the day care center regarding her child and remained unreachable for hours. The only backup care provider preauthorized to pick up Z.M. from day care, C.M.'s mother N.M., was likewise unreachable and did not undertake to pick up Z.M. in C.M.'s stead. (C.M. never claimed she had relied on N.M. to do so.) When C.M. finally arrived at CFSA after 9:00 p.m. on October 21 to get Z.M., she admitted she had been smoking marijuana that evening. She did not proffer a reasonable explanation for her non-appearance and unavailability. C.M. also could not provide the name or contact information of the friend she said she had asked to pick up her eighteen-month-old child, and could not substantiate her claim they made such an arrangement by text messages. Da-Da was not on the day care center's list of persons to whom Z.M. could be released, C.M. had not advised the day care that Da-Da would be coming for Z.M. in her place, and she made no effort to confirm he had

successfully collected her child and gotten him safely home.  If C.M. really was relying on Da-Da, which the magistrate judge doubted, the arrangement in itself bespoke irresponsibility and raised red flags.

Much the same thing happened again just ten days later.  After having agreed with CFSA to implement a safety plan for Z.M. (a plan with which C.M. apparently did not comply), C.M. again left her child at day care past closing time, again was unresponsive, again did not make a reasonable alternative arrangement for Z.M. to be picked up, and again had no satisfactory excuse.

C.M.'s testimony at trial did nothing to alleviate the concerns her behavior raised.  The magistrate judge understandably found it "troubling" that C.M. professed to believe Da-Da actually had gotten Z.M. from the day care on October 21, did not seem to realize she had failed not once but twice to make proper arrangements for her child to be picked up, and did not "really understand the circumstances that she finds herself in."  Significantly, too, the District and GAL witnesses informed the magistrate judge that cooperation and communication with C.M. had been difficult and concerns remained about Z.M.'s care.

We hold that the District presented sufficient evidence to support the magistrate judge's finding that Z.M. was a neglected child within the meaning of D.C. Code § 16-2301(9)(A)(iv), and that the magistrate judge did not err or abuse

her discretion by failing to consider the relevant context of C.M.'s failure to "assume the responsibility" for Z.M.'s care when his day care center "state[d] an intention to discontinue such care."[28]

## III.

For the foregoing reasons, we reverse the judgment of the Superior Court and reinstate the magistrate judge's finding of neglect.

*So ordered.*

DEAHL, *Associate Judge*, dissenting: I respectfully dissent and would affirm the Superior Court's judgment that the evidence does not support a finding of neglect. In reaching its contrary conclusion, the majority adopts a far broader reading of D.C. Code § 16-2301(9)(A)(iv) than this court has ever endorsed. It is an interpretation that is both at odds with the statutory text and that introduces profound uncertainty into this court's neglect jurisprudence.

A parent does not "refuse[] . . . to assume responsibility for the[ir] child's care" by failing to live up to that responsibility on one or two occasions. Rather, to

---

[28] We express no view on the magistrate judge's determination that Z.M. also was a neglected child within the meaning of D.C. Code § 16-2301(9)(A)(ii).

say somebody refuses to assume a responsibility is to say that they have indicated a lack of intention to even attempt to perform it going forward. That is no doubt why, in the forty-five years since its enactment, we have never previously confronted the question of whether a parent refuses to assume parental responsibility under (9)(A)(iv). It is invariably an obvious and uncontested point; the parent who refuses to assume responsibility has no cause to contend otherwise. The statutory phrase refers to somebody who indicates an intention to desert their child, not an "isolated instance of unavailability," as the majority now treats as a presumptive case of neglect under this provision. *Ante* at 18.

To avoid the absurd results of that standalone test, the majority next layers a totality of circumstances test onto (9)(A)(iv), requiring a court to "consider the surrounding circumstances and reasons for the parent's unavailability, as well as its duration, persistence, and recurrence." *Ante* at 18. The majority needs this gloss—which it derives not from the statutory text but from the legislative history of a different provision in an entirely different Title—only because it first conflates a moment's unavailability with a refusal. But the court's two-step inquiry is contrary to the plain text of (9)(A)(iv), which the majority in one breath acknowledges "makes discrete conduct the very basis" for a neglect finding, only to import a totality of circumstances test in its next breath. *Ante* at 17. The majority also shifts the burden to the momentarily absent parent to justify themselves and provide a

"reasonable explanation or satisfactory excuse for an isolated instance of unavailability," *ante* at 18, in contravention of our longstanding precedents that it is the government's burden to demonstrate neglect.

That brings me to my jurisprudential concern. The totality of circumstances test that the majority now reads into (9)(A)(iv) already inheres in our robust body of precedents informing what constitutes a lack of "proper parental care" under (9)(A)(ii). I see the majority as building an off-ramp from those precedents, and it leads to an uncharted wilderness. Where the government does not or cannot meet the standards we have refined over many decades under (9)(A)(ii), it now has a workaround and can test the bounds of this new and uncertain path, so long as it can show a moment's unavailability (as is routinely the case in (9)(A)(ii) cases). I cannot predict where this new road leads because its bounds are not marked by any principles or statutory text. I see no justification for starting down it.

## I.

### A.

Begin with the text. Subsection (9)(A)(iv) includes, within the definition of a neglected child, one whose "parent, guardian, or custodian *refuses or is unable* to assume the responsibility for the child's care" after another "providing care for the child states an intention to *discontinue* such care" (emphases added). The majority

has misinterpreted each of the highlighted terms. At the outset, like the magistrate judge and the government before it, the majority never tells us whether, in its view, C.M. refused to assume responsibility for Z.M., or instead was unable to do so. By process of elimination, I can only assume the former. There is no question that C.M. was able to provide care for Z.M. Nobody contends she suffered from some mental, physical, or other incapacity that left her unable to perform the task. Our only precedents interpreting (9)(A)(iv) in the decades since its enactment concerned whether a parent was "unable" to provide care, and in both cases the parents were incarcerated when another surrogate caregiver discontinued care. *See In re K.J.*, 11 A.3d 273, 278 (D.C. 2011) (mother was unable to care for child while incarcerated and did not arrange care for child within thirty days of grandmother discontinuing care); *In re W.T.L.*, 825 A.2d 892, 893-94 & n.3 (D.C. 2002) (mother was "repeatedly incarcerated," and otherwise "homeless," and "failed even to contact the caretaker" who had discontinued care). They do not resemble this case.

That leaves "refuses . . . to assume the responsibility for the child's care," a phrase we have never previously interpreted because it is so rarely a bone of contention. One would ordinarily say as a matter of plain language that a parent who sincerely expresses a willingness to assume care for their child and is able to do so has not refused to assume responsibility. They have perforce assumed responsibility for the care of their child, and whether they adequately carry out their responsibilities

is another matter entirely (concerning a different provision of the neglect statute, (9)(A)(ii), *see infra* Part II).[1] C.M.'s parenting failures, while no doubt serious and worthy of investigation, did not amount to a refusal to assume care for Z.M in any ordinary sense of the phrase.

Yet, I take the majority to hold that C.M. refused to assume responsibility for Z.M.'s care when she failed to pick Z.M. up by the close of the daycare's pickup window on each of two discrete instances. Unlike the statute—which treats a refusal to assume parental responsibility as neglect, full stop—the majority treats C.M.'s tardiness only as presumptively neglectful, triggering a burden-shift whereby C.M. must provide an adequate explanation for her momentary unavailability to avoid a finding of neglect. *Ante* at 17-18. In a nutshell, the majority first strips the statutory phrase of its plain meaning. Then, to save itself from the resulting absurdities of that initial misstep, it supplants the statutory term with its own atextual totality of circumstances test for assessing whether the reasons for the parent's momentary

---

[1] I agree with the majority that "(9)(A)(iv) does not require proof of abandonment, which is the basis for a neglect finding under subsection (9)(A)(i)." *Ante* at 16. Unlike (9)(A)(i), 9(A)(iv) is anticipatory. It permits a finding of neglect before abandonment occurs, where one caretaker states an intention to discontinue care (i.e., to abandon) and an alternate potential caretaker cannot or indicates they will not take on the parenting role. When (9)(A)(iv) is not being invoked in such an anticipatory way, then (9)(A)(i) provides the more relevant framework into actual abandonment.

absence are adequate. And while the majority describes those two steps as going to a mere "prima facie" case of neglect under (9)(A)(iv), it never tells us what more is needed. Its apparent answer is that nothing more at all is needed, so that what it guises as a "prima facie" case is in fact a conclusive one.

I see it differently. In order to refuse to assume a responsibility, a person must—either expressly or through their conduct[2]—indicate a lack of intention to undertake the task going forward. *See refuse*, Webster's Third New Int'l Dictionary 1910 (2020) ("to show or express a *positive unwillingness* to do or comply with (as something asked, demanded, expected)" (emphasis added)). It is not a synonym for a moment's unavailability, even if that unavailability is unexplained. Nor does it mean immaturity or even irresponsibility. Consider an example: if I am tasked with taking out the trash every night, and remember to do so nine out of every ten nights, have I refused to assume responsibility for taking out the trash? I don't think so; not in any ordinary sense of the phrase, even if I have no good reason for my occasional

---

[2] I agree with the majority in the limited regard that one can refuse to assume a responsibility without expressly saying so. A refusal to assume care for a child may be inferred, in the absence of an express refusal, where there is a persistent and enduring course of conduct demonstrating that the parent has no intention of even attempting to carry out their responsibilities. One or two failures to pick up a child from daycare on time does not come particularly close to showing that. It is sufficient cause to investigate whether Z.M. lacks proper parental care under (9)(A)(ii), but it does not amount to a refusal to assume responsibility under (9)(A)(iv).

oversights. Perhaps somebody aggrieved by my lapses might hyperbolically describe me as refusing to assume my responsibility for effect. But if I have accepted the responsibility without objection and attempt to carry it out, then dropping the ball now and then is not a refusal to assume it. People are imperfect in carrying out their responsibilities all of the time. Only when their lapses are so persistent that they rise to the level of recalcitrance may they fairly be described as refusing to assume those responsibilities. A lapse (or two) is not recalcitrance.[3] To the extent there is any ambiguity in what it means to refuse to assume responsibility to care for a child, the rest of the provision supports my understanding of that phrase.

In order to fit circumstances like these into (9)(A)(iv), the majority also misconstrues the word "discontinue." The question of refusal comes into play only after "the person or institution which is providing for the child states an intention to *discontinue* such care." D.C. Code § 16-2301(9)(A)(iv) (emphasis added). A

---

[3] The majority asserts that the neglect statute is remedial in nature, and should therefore be construed broadly. *Ante* at 16 (citing *In re S.G.*, 581 A.2d 771, 778 (D.C. 1990)). That does not help the majority's cause because even the broadest reading of subsection (iv) would not apply to these facts. Moreover, the entire rationale for reading the neglect statute broadly is to promote "the best interest of the child," *id.*, a goal the majority does not advance. In this case, the guardian ad litem, who is tasked with advocating for the best interest of the child, defends the Superior Court's judgment that there was no neglect in this case. While we are of course not bound by the guardian ad litem's position, I am unaware of any prior case in which we have reversed a Superior Court's judgment that a child was not neglected despite the child's representative defending that judgment on appeal.

daycare's daily closure is not a discontinuation of care. To "discontinue" care means to "end the operations or existence" of that care, such that a student's expulsion would mark a discontinuation of care, but the end of the school day does not. Webster's Third New Int'l Dictionary 646 (2020). In illustrating the meaning of the word "discontinue," Webster's Dictionary gives examples of a "*discontinued* bus service between two points," a "school [that] was *discontinued* after a sharp drop in enrollments," and a student who "found it necessary to [*discontinue*] her course in Spanish." *Id.* In each case, the word "discontinue" refers to the indefinite cessation of the activity, not a scheduled recess. A bus line is not discontinued during its off-hours; a school is not discontinued at the end of each day; and a student does not discontinue her course in Spanish at the end of each period of study.

Watering-down the word discontinue in this way erases the essential bounds of (9)(A)(iv). Before today, we have applied (9)(A)(iv) only in situations where a child's primary caretaker truly discontinued care, meaning they indicated they were done providing care altogether. *See In re K.J.*, 11 A.3d at 277 (grandmother told child "she could not come back to her home"); *In re W.T.L.*, 825 A.2d at 894 (surrogate caretaker was "unable to" care for child "because of the demands of rearing her own children"). In those situations, we have correctly considered the parent's persistent and enduring (not momentary) inability to step in and provide care, over the course of many weeks and months, as satisfying (9)(A)(iv)'s standard

for neglect. *See, e.g.*, *In re K.J.*, 11 A.3d at 278 (upholding neglect finding under (9)(A)(iv) where mother "did not make any arrangements for K.J. during the thirty-day CFSA investigation" which followed the discontinuation of grandmother's care). We have never applied (9)(A)(iv) to anything resembling a daycare's nightly closures because a nightly closure is not a discontinuation of care. It is only by misreading the word discontinue to mean a moment's break in care that the majority lays the groundwork for holding that a moment's unavailability amounts to a refusal to assume care. It misreads the statutory text in both respects, each building on the other.

The majority's reading of the word discontinue also renders the statute incompatible with any plausible view of what the legislature intended. Why would it matter to any legislator whether or not a refusal to assume care was preceded by another's indication that they would discontinue care (as the majority reads those terms)? That seems a perverse scheme. Consider two scenarios: the parent who simply walks out of the house and leaves their young child unattended for an hour, and the parent who employs a babysitter and arrives home an hour after the babysitter's stated departure time. One might naturally think the parent in the second scenario is the less blameworthy of the two, given that the babysitter might begrudgingly stay beyond their stated departure time (whereas the first child is

definitely unattended for that hour).[4]  But not under the majority's approach, under which only the second has been neglectful under (9)(A)(iv), while the parent who simply walked out for an hour would not be.  I can conceive of no good explanation for that incongruous result or why we would think the legislature intended it.

Today's holding is also at odds with other provisions in the neglect statute.  For instance, subsection (9)(A)(vii) instructs that a neglected child is one "who has resided in a hospital located in the District of Columbia *for at least 10 calendar days* . . . despite a medical determination that the child is ready for discharge from the hospital," but only if the parent "has not taken *any* action or made *any* effort to maintain a parental, guardian, or custodial relationship or contact with the child" (emphasis added).  The majority's interpretation of (9)(A)(iv) swallows (9)(A)(vii) whole.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) (citations omitted) (It is "one of the most basic interpretive canons" that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."). Contrary to the plain text of (9)(A)(vii), it makes no difference if the child has been in the hospital fewer than ten days or if the parent has made substantial but unsuccessful efforts to retrieve their child.  So long

---

[4] Note that the majority's test would seem to endorse a neglect finding even when the babysitter does in fact stay beyond their stated departure time.

as the hospital determines that the child is ready for discharge and thereby indicates an intent to discontinue care, the majority reasons that the parent's momentary unavailability on minute one of day one after that indication makes out a case of neglect under (9)(A)(iv), rendering (9)(A)(vii) irrelevant. Perhaps more importantly, (9)(A)(vii) provides insight into what degree of parental absenteeism the legislature believes amounts to per se neglect. Ten days without "any action or . . . effort to maintain a parental" relationship is the answer provided by (9)(A)(vii), making the majority's answer of several minutes or hours as to (9)(A)(iv) incompatible with the statutory text.

**B.**

I agree with the majority that "discrete conduct" is "the very basis" of a neglect finding under (9)(A)(iv). *Ante* at 15. A finding of neglect is not only justified but required any time a parent "refuses . . . to assume the responsibility for the child's care" after another caretaker "states an intention to discontinue such care." The fact that such a refusal amounts to neglect, per se, is further evidence still that the legislature meant "refusal" to connote something quite serious, along the lines I have explained above, and not in the more trivial sense the majority adopts. *See generally In re A.H.*, 842 A.2d 674, 684 n.16 (D.C. 2004) (government's burden in neglect proceedings "is commensurate with the gravity of the petition for

intervention in the lives of parent and child"). The majority's contrary view leaves it in a conundrum. It would be untenable to say that a parent neglects a child simply by being late to pick them up from school, daycare, or the babysitter; what parent has not been guilty of that? Thus, the majority retreats from its promise to focus on discrete conduct and invents a new totality of circumstances "step two" of the inquiry, and assures that the government will be unable to and "presumably . . . will not seek to, establish" neglect in any case where there is "a reasonable explanation or satisfactory excuse for an isolated instance of unavailability." *Ante* at 18. The majority's presumption is unwarranted, and its totality of circumstances test just layers another atextuality into its framework.

The majority instructs that when a parent is momentarily unavailable a government official or court "must consider the surrounding circumstances and reasons for the parent's unavailability, as well as its duration, persistence, and recurrence" in order to ascertain whether the parent can offer a "reasonable explanation or satisfactory excuse." *Ante* at 18. The court gleans that test from (1) "common sense," which more directly counsels against the majority's reading of the statutory terms in the first place, and (2) the legislative history of D.C. Code § 4-1301.05, which contains not so much as a cross-reference to (9)(A)(iv), and is

entirely unilluminating on the question before us except as support for the view that some minutes or hours of parental unavailability does not equate to neglect.[5]

Finally, the majority's two-step approach to (9)(A)(iv), unlike any other provision of § 16-2301(9)(A), shifts the burden to the parent to demonstrate the absence of neglect. Once the government has shown a moment's unavailability, the majority places the onus on the parent to rebut that presumptive showing of neglect by offering "a reasonable explanation or satisfactory excuse . . . such as unforeseen circumstances beyond an attentive and concerned parent's control or a good faith mistake by the parent." *Ante* at 18. That burden-shifting regime contravenes the countless precedents in which we have held that it is the government's burden to demonstrate neglect. *See, e.g.*, *In re B.C.*, 257 A.3d 451, 461 (D.C. 2021); *ante* at 11 & n.6 (citing *In re N.P.*, 882 A.2d 241, 247 (D.C. 2005)).

---

[5] The majority reads the statutory history of § 4-1301.05, concerning how police respond to reports of suspected neglect, as support for the proposition that a child who is "left alone or without adequate supervision" is not necessarily neglected. *Ante* at 19-20 & n.23 (citing Council of the District of Columbia, Report of Committee on Human Resources and Aging on Bill 2-46, at 4 (Mar. 30, 1977)). I agree with that much. But that is reason to reject the majority's statutory reading from the outset, not a reason favoring its two-step approach of diluting the statutory test, treating it as a presumptive case of neglect, and then supplementing it with a totality of circumstances test. It is only by assuming that the Council shares its view that a moment's unavailability is a presumptive case of neglect that the majority discerns some support for its view in the legislative history; once stripped of that assumption, even this tangential legislative history undercuts the majority's view.

**II.**

That brings me to my jurisprudential concern. We have a well-developed body of precedents analyzing when a child is "without proper parental care or control" under the more regularly invoked provision of the neglect statute, D.C. Code § 16-2301(9)(A)(ii). Unlike (9)(A)(iv), which targets discrete conduct, (9)(A)(ii) is geared toward a totality of circumstances by its very terms; it asks whether the child is "without proper parental care." In interpreting that broad statutory phrase, we have explained that "'the trial court's inquiry must go beyond simply examining the most recent episode,' or a single snapshot [in time], and instead 'must consider *the entire mosaic* in making its determination.'" *In re P.B.*, 54 A.3d 660, 666 (D.C. 2012) (first quoting *In re T.G.*, 684 A.2d 786, 788 (D.C. 1996), then quoting *In re N.P.*, 882 A.2d at 250) (emphasis added). Because we already have a well-worn inquiry for determining whether a child is without proper parental care under (9)(A)(ii), the majority's creation of an alternative totality of circumstances test under (9)(A)(iv) demands some justification that it never provides.

For starters, the majority does not tell us what its new test is indexed to beyond any particular judge's sensibility of what ought to be deemed neglect. Put another way, it does not tell us what bottom-line question the totality of circumstances speaks

to under (9)(A)(iv). I see two possibilities. Perhaps it is entirely duplicative of the (9)(A)(ii) inquiry, and the new totality of circumstances test under (9)(A)(iv) is also geared toward discerning whether the child is without proper parental care. If that is the case, then why hoe this new row? The only purpose of that would be to circumvent our (9)(A)(ii) precedents in those cases where the government cannot or has not made the showing required, as occurred here, where the government offered little more than a snapshot of the care provided for Z.M. *See, e.g.*, *In re T.G.*, 684 A.2d 786, 789 (D.C. 1996) (reversing a neglect finding based on "deplorable" living conditions observed on a single day, noting that "[n]ot enough focus . . . was centered on the physical or mental condition of the children overall"); *In re K.M.*, 75 A.3d 224, 233-34 (D.C. 2013) (finding evidence of neglect "insufficient" where evidence of parent's delusional disorder was unaccompanied by evidence of "how likely it actually was that [potential] harms would befall" the child).

The more likely explanation is that the majority is doing something else entirely and jettisoning a hallmark of our neglect jurisprudence that "the relevant focus for the court . . . is the child's condition, not the [parent's] culpability."[6] *In re*

---

[6] As further support that this is the majority's chosen path, it says that "to the extent the reviewing judge also understood subsection (9)(A)(iv) to require a showing of an adverse impact on the child, that too was a misreading of a statute meant to protect children from harm. There is no such requirement in subsection (9)(A)(iv)." *Ante* at 16.

*E.H.*, 718 A.2d 162, 169 (D.C. 1998) (quoting *In re B.C.*, 582 A.2d 1196, 1198 (D.C. 1990) (per curiam)). If that is the case, the majority has opened up a brand-new avenue for the government to intervene in a parent-child relationship without first showing that the child is actually at any risk. *See In re A.H.*, 842 A.2d at 684 n.14 ("State intrusion in the parent-child relationships is, presumptively, a last resort."). As we have often stated, the purpose of the neglect statute is to protect at-risk children, not to punish blameworthy behavior by parents. *See, e.g., In re T.T.C.*, 855 A.2d at 1119 ("[T]he relevant focus for the court . . . is the children's condition, not the [parent's] culpability . . . because the purpose of the neglect statute is to protect the child from harm.").[7] That is why our precedents interpreting (9)(A)(iv)'s neighboring provisions focus on the condition of the child, consistently requiring a holistic showing that the child's welfare is actually at risk. *In re A.H.*, 842 A.2d at 685 & n.16 (it is the government's "responsibility in the first instance to take the trouble to investigate the overall family situation and present an adequate evidentiary picture").

---

[7] In *In re T.T.C.*, we read D.C. Code § 16-2301(9)(A)(iii) to require actual risk to the child, even though that requirement appears nowhere on the face of the provision. *See* 855 A.2d at 1121. In that case, we said that an incarcerated father's failure to provide the appropriate legal protections for the person he chose as his children's caretaker only became neglect when the children's drug-addicted mother appeared on the scene to reclaim custody. The decisive factor was not the father's culpability, but the effect of his omission on the purportedly neglected children.

It is not clear to me which of these two ill-advised paths the majority has started down.  I see both of them as substantial departures from our precedents and as contravening the text of (9)(A)(iv).  I therefore dissent.